No. 95-1962

Albert Burnham; Ronald     *
Marchese; Michael Kohn;     *
Louise Kohn,     *
    *
         Appellees.     *
    *
      v.     * Appeal from the United States
    * District Court for the
Lawrence Ianni, in his     * District of Minnesota
official capacity as     *
Chancellor of the University     *
of Minnesota at Duluth and     *
in his individual capacity,     *
    *
         Appellant.     *

Submitted:  December 11, 1995

Filed:  October 16, 1996

Before McMILLIAN, JOHN R. GIBSON and BEAM, Circuit Judges.

McMILLIAN, Circuit Judge.

This action was brought in the United States District Court for the District of Minnesota pursuant to 42 U.S.C. § 1983 by Albert Burnham and Ronald Marchese, two history professors at the University of Minnesota at Duluth (UMD), and Michael Kohn and Louise Kohn (the Kohns), two former UMD history students (collectively plaintiffs), against Lawrence Ianni, Chancellor of UMD, alleging that Ianni deprived them of rights protected by the free speech clause of the First Amendment.[1]  Ianni appeals from the

---

[1]In their amended complaint, plaintiffs sought a declaration that Ianni's actions were unconstitutional, injunctive relief against Ianni in his official capacity, and monetary relief against Ianni in his individual capacity in the amount of at least $50,000, plus interest.  Appellant's Appendix at 4 (amended complaint).

district court's order denying his motion for summary judgment on the basis of qualified immunity. Burnham v. Ianni, 899 F. Supp. 395 (D. Minn. 1995). For reversal, Ianni argues that the district court erred in holding that he violated plaintiffs' clearly established constitutional rights by ordering the removal of two photographs, one of Burnham and the other of Marchese, from a display case located in a hallway outside the UMD history department's classrooms. For the reasons discussed below, we reverse the order of the district court and remand the case to the district court with directions to enter judgment for Ianni.

## I. Background

The underlying facts of this case are generally not in dispute. Id. at 397. The two photographs of Burnham and Marchese, which are at the center of this dispute, were originally part of a visual exhibit conceived of and created by the Kohns while they were students at UMD. The Kohns were both members of the UMD history club, for which Burnham was the faculty advisor. The Kohns' objective in displaying the exhibit was to convey to observers the history faculty's diverse interests. In photographing the UMD history professors, the Kohns asked each to pose with a "prop" of his or her own choice, related to his or her areas of interest. The photographs were then juxtaposed with written descriptions of the subject's academic background, historical heroes, and a chosen quotation. Burnham, who has a special interest in American military history, chose to be photographed wearing a coonskin cap and holding a .45 caliber pistol; Marchese, who specializes in ancient Greece and Rome, posed wearing a cardboard laurel wreath and holding a Roman short sword.

On May 5, 1992, an officer with the UMD campus police, acting under instructions from Ianni, removed the photographs of Burnham and Marchese from the display case.[2]  Ianni ordered the removal of the two photographs because he considered them inappropriate for display in light of events that had occurred over the previous year.

In June of 1991, approximately one year before the photographs of Burnham and Marchese were removed from the display case, Sandra Featherman was appointed to the post of UMD vice chancellor.  Shortly thereafter, she began receiving graphically violent threats from an anonymous source or sources using the identities "Deer Hunters" and "Prince of Death," and warning her that if she did not stay away from Duluth, she would be kidnapped or killed.  At the same time, a phony memorandum, bearing a forged signature purporting to be Ianni's, was circulated through the UMD mail system and distributed on and around campus.  This fraudulent memorandum referred to the "conspiracy to kidnap Sandra Featherman going on at UMD."  Appellant's Appendix at 17 (forged memorandum).

Beginning in March 1992, UMD history professor Judith Trolander became the target of threats similar to those directed at Featherman.  Both Featherman and Trolander had been involved in a program to improve diversity and equality on the UMD campus.  A flyer entitled "Target Information" was anonymously posted around campus which said, among other things, "The Imperial Council of Deer Hunters Proclaim Open Season on Judy Trolander Lesbian Feminist Bitch."  This document told the reader where to find Professor Trolander's picture and where she lived, and stated the following:

_____

[2]Burnham then removed the remaining photographs in the Kohns' exhibit.

-3-

She will be a good target for shooting at long range. The house has large windows and the terrain is clear of obstacles in all directions. Shooting from the beach or even from a boat in the bay or lake Superior is feasible. A 30-60 rifle with 20X2 Bushnell scope would be a suitable weapon with dum-dum bullets dipped in poison. Don't forget to put in a couple of clicks in the crosshairs for windage as the wind is usually strong there. It is recommended that the hunter shoot from behind the Surf and Sand Health Center, if there is return fire from the house it well only kill a few old people. She is the only occupant of the house, so it is OK to shoot silhouettes on drawn shades.

Get cracking you kill crazy buckaroos. Its OK to kill her, the Imperial Counsel rules UMD, the commission on women is dissolved.

Also, all faculty members ordered to participate in Featherman's administrative development project will be sentenced to death along with their pets, children, and spouses if they comply with these orders. Any one who cooperates with Featherman will have their target information published.

The deer hunters need target information on Featherman, just mention where she lives in the faculty club and everything will be taken care of.

Appellant's Appendix at 38.


In an attempt to respond to the tension and widespread fear of violence created by these terroristic threats, Ianni distributed on campus a memorandum dated March 16, 1992, assuring that the matter was being investigated by local and federal authorities, that every effort would be made to bring the perpetrators to justice, and that the school remained committed to improving the conditions of women and minorities on campus.


On or about March 27, 1992, less than a month after the so-called "Target Information" flyer was posted, the photographs of Burnham and Marchese were placed in the display case along with the other photographs and written materials contained in the Kohns' exhibit. Judith Karon, UMD's director of personnel and affirmative

action officer, began receiving complaints and anonymous calls objecting to the depictions of the two faculty members holding weapons, particularly the picture of Burnham holding a gun. Professor Trolander, who was extremely upset about the photographs, also contacted Karon. Karon made efforts to have the photographs removed, expressing her belief that they were inappropriate in light of the recent events and the atmosphere of tension and fear on campus. Several meetings involving Karon, Ianni, the Kohns, Burnham, Marchese, and other faculty members in the history department, were held to discuss the two photographs. The chairman and other members of the history department steadfastly opposed their removal. See Appellant's Appendix at 50 (internal history department memorandum: "[s]omehow, this ugly trend of History governance by external administrators and bureaucrats must be called into account; if the photo display is our line in the sand, so be it"). On May 4, 1992, Ianni ordered the two photographs removed from the display case.

Plaintiffs filed this § 1983 action alleging that the removal of the photographs violated their First Amendment right of free speech. Ianni filed several motions, including a motion for summary judgment on qualified immunity grounds. The district court denied that motion, explaining:

> On the facts of this case, the court finds, without hesitation, that "[t]he contours of the right [were] sufficiently clear [so] that a reasonable official would understand that what he [did] violates that right." . . . Ianni asserts that his actions were taken with the intent to "maintain a positive and efficient working and learning environment conducive to the mission of an academic institution." . . . Chancellor Ianni is, presumably, an educated and erudite person. It is inconceivable to this court that the Chancellor of a major University could have failed to know that [the] First Amendment forbade, except in the narrowest of circumstances, the type of conduct at issue here.

Burnham v. Ianni, 899 F. Supp. at 400-01 (citations omitted). Having held that plaintiffs' clearly established First Amendment rights had been violated, the district court also denied Ianni's motion to dismiss. Id. at 404. In reaching its conclusion on the merits, the district court noted that the display case was a nonpublic forum. Id. at 403. Therefore, the district court held, the suppression of speech at issue in the case was subject to a reasonableness test. Id. (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49 (1983) (Perry)). The district court then determined that the photographs were removed because they were offensive to some viewers and, therefore, the suppression was content-based and not reasonable. Id. at 403-04. The district court stated:

> Whether the photographs advocated anything is irrelevant in this context; on the contrary, it was the perception that the photographs somehow advocated support for those [who] had made the threats which motivated their removal. This is an impermissible content based restriction. . . . That some members of the faculty and administration were discomfited by the sight of the photographs displaying weapons is insufficient to justify the removal of the photographs.

Id. at 404. This appeal followed.

## II. Discussion

### A. Appellate Review

As stated above, the underlying essential facts are not in dispute. Under these circumstances, we have appellate jurisdiction to review the district court's order denying Ianni's motion for summary judgment on qualified immunity grounds insofar as the district court held, as a matter of law, that Ianni violated plaintiffs' clearly established First Amendment rights. See Johnson v. Jones, 115 S. Ct. 2151, 2156 (1995) (citing Mitchell v.

-6-

Forsyth, 472 U.S. 511, 530 (1985) (interlocutory appellate jurisdiction exists where qualified immunity issue involves application of "clearly established" law to a given set of undisputed facts)).

"'While the denial of a motion for summary judgment is not normally an appealable final judgment, an exception exists for a summary judgment order denying qualified immunity . . . [and for] issues of law that are closely related to the qualified immunity determination.'" Beyerbach v. Sears, 49 F.3d 1324, 1325 (8th Cir. 1995) (quoting Henderson v. Baird, 29 F.3d 464, 467 (8th Cir. 1994), cert. denied, 115 S. Ct. 2584 (1995)). We review the district court's denial of Ianni's motion for summary judgment de novo. Id. (citing Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992)). Summary judgment is appropriate where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c).

B. Nature of plaintiffs' claim

In the present case, plaintiffs maintain that the two photographs of Burnham and Marchese constitute protected speech because they capture and convey an informational message concerning the UMD history department. Brief for Appellees at 4 ("[t]he exhibit was intended to inform students and prospective students about the interests and areas of expertise of the professors in the department"), 34 (the photographs "expressed and advocated the professors' interests in the traditional study of classical and American military history"). Plaintiffs describe the message purportedly conveyed by the two photographs as follows.

> For his photograph, Professor Marchese elected to pose with an ancient Roman short sword while wearing a cardboard laurel wreath. . . . He chose to pose with the Roman sword for two reasons. First, he likes to use

tangible objects in his lectures, and he had previously used the sword in that way. Second, one of his interests is military history. He believes that a thorough knowledge of the ancient world must include an appreciation for the military culture and techniques that allowed Rome to gain and hold an ascendancy over the Mediterranean world. His courses on ancient history include far more than military history, but he thinks that military history is an important aspect of that era. Hence he believed the Roman sword was an appropriate "prop" for his photograph.

Professor Burnham's special interest in American history includes military history in particular. Among his historical heroes he listed were John Adams and David Crockett. Consistent with his professional interests, he posed with a .45 caliber military pistol, wearing a coonskin cap.

Id. at 3.

## C. Burnham's and Marchese's First Amendment rights

Although plaintiffs have failed to articulate this analytical premise, the two professors' claims derive from the assertion that they were engaging in non-verbal expressive conduct by their choices of clothing and props, as worn and displayed in each of their respective photographs.[3] Accordingly, in determining whether Ianni violated Burnham's and Marchese's rights in suppressing the two photographs, our analysis is guided by this court's recent

---

[3]While plaintiffs also maintain that the photographs were intended to portray the faculty in an "informal" and "somewhat humorous" manner, Brief for Appellees at 2, they do not argue, nor would we find, that the photographs were intended to be forms of entertainment. Accordingly, we need not consider the First Amendment standard applicable for some forms of entertainment. Cf. Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ., 993 F.2d 386, 390-91 (4th Cir. 1993) (because college fraternity's "ugly woman contest" was similar in nature to a theatrical performance, it was an inherently expressive form of entertainment and entitled to constitutional protection despite offensive caricature of African-American woman).

decision in <u>Tindle v. Caudell</u>, 56 F.3d 966 (8th Cir. 1995) (<u>Tindle</u>), addressing the standards that apply to this precise type of First Amendment claim.

In <u>Tindle</u>, a police officer with the Little Rock Police Department (LRPD) brought a § 1983 action against the chief of police on grounds that his First Amendment rights were violated when he was given a thirty-day suspension for appearing at a Halloween party wearing a blackened face, dressed in bib overalls and a black curly wig, and carrying a watermelon.[4] In acknowledging that the plaintiff had facially asserted a First Amendment right, this court stated:

> What one chooses to wear can communicate an expressive message to others. . . . Wearing a particular outfit or costume is non-verbal conduct that is protected as speech under the first amendment if it is intended to convey a "particularized message" and if the likelihood is great that the message will be understood by those who view it.

<u>Id.</u> at 969; <u>accord</u> <u>Tinker v. Des Moines Indep. Com. Sch. Dist.</u>, 393 U.S. 503, 505-06 (1969) (wearing black armband to express students' opposition to Vietnam War was symbolic act protected by the free speech clause of the First Amendment); <u>Dunn v. Carroll</u>, 40 F.3d 287, 291-92 (8th Cir. 1994) (<u>Dunn</u>) (wearing patch bearing American flag during months preceding the Persian Gulf War was nonverbal conduct protected under the free speech clause). However, this court then went on to explain in <u>Tindle</u> that, even if a person's chosen appearance is found to be expressive non-verbal conduct or speech, it is not entitled to absolute protection. 56 F.3d at 970. Because the plaintiff in <u>Tindle</u> was a public employee, and the state was acting in its capacity as his employer in suspending him

---

[4]The party, which was held at the Fraternal Order of Police Lodge, was not an official police department function but was attended by off-duty police officers and their guests. <u>Tindle v. Caudell</u>, 56 F.3d 966, 968 (8th Cir. 1995).

on the basis of his speech, his First Amendment claim was to be analyzed according to the following "two-step test":

> The first question is whether the employee's speech addresses a matter of public concern. Connick v. Myers, 461 U.S. 138, 146 (1983) [(Connick)]. If it does, then the court must balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568 (1968) [(Pickering)].

Tindle, 56 F.3d at 970; accord Waters v. Churchill, 511 U.S. 661, ___, 114 S. Ct. 1878, 1884 (1994) (Waters). It is the job of the court to apply this analysis to the facts. Waters, 114 S. Ct. at 1884 (citing Connick, 461 U.S. at 148 n.7 & 150 n.10).

In the present case, we will assume, for the sake of argument, that Burnham and Marchese have adequately demonstrated that they sought to convey a "particularized message" through the clothing worn and props held in each of their respective photographs. That message, as they describe it, was to "express[] and advocate[] [their] interests in the traditional study of classical and American military history." Brief for Appellees at 34. We will further assume, for the sake of argument, that the likelihood was great that this "particularized message" would be understood by those who viewed the photographs.

It is undisputed that Burnham and Marchese are public employees and that Ianni was acting in his official capacity as a public employer representing the interests of UMD when he ordered the removal of the photographs from the display case located in the corridor near the UMD history department's classrooms. Therefore, consistent with Tindle, the suppression of the two photographs must be analyzed according to the two-part analysis required by the Pickering-Connick-Waters line of Supreme Court cases dealing with

-10-

the First Amendment rights of public employees.[5]  As the Supreme Court observed in Waters, "the government as employer indeed has far broader powers than does the government as sovereign."  114 S. Ct. at 1886.  Accordingly, the courts "have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large."  Id. at 1887; accord Tindle, 56 F.3d at 972 (same).

Consistent with Pickering and its progeny, we first consider the issue of whether Burnham's and Marchese's expressive conduct, as captured in the two photographs, addressed a matter of public concern.  In addressing the meaning of speech on a matter of "public concern," the Supreme Court has explained: "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."  Connick, 461 U.S. at 146.  Assuming that Burnham's and Marchese's conduct "expressed and advocated the professors' interests in the traditional study of classical and American military history" and "inform[ed] students and prospective students about the interests and areas of expertise of the professors in the department," Brief for Appellees at 34, 4, it

---

[5]Plaintiffs make much of the fact that the present case is different from the public employment cases cited by Ianni in that it does not involve a personnel action such as a termination or a suspension of Burnham or Marchese from their employment.  We find this distinction irrelevant.  Ianni removed the photographs in part because he considered them detrimental to the collegiality within the history department.  Appellant's Appendix at 7 (Affidavit of Lawrence Ianni, ¶ 9).  The fact that Ianni chose to respond to what he considered to be inappropriate employee conduct by the narrowly tailored act of suppressing the photographs themselves makes this case no less employment-related than if he had terminated Burnham and Marchese as an indirect means to remove the photographs or if he had terminated or suspended them after the fact for refusing to remove the photographs voluntarily.

arguably did address a matter of public concern.  We will assume for the sake of argument that it did.  Thus, we next proceed to balance the interests of Burnham and Marchese in commenting upon or expressing their particular areas of academic interest, through "humorous" and "light-hearted" portrayals of themselves, against the interests of UMD, as their employer, in avoiding the potential disruption that Ianni predicted would result from the continued display of the photographs.  According to Ianni, his intent in removing the two photographs "was to maintain a positive and efficient working and learning environment conducive to the mission of an academic institution."  Appellant's Appendix at 8 (Affidavit of Lawrence Ianni, ¶ 11).  He explained in his affidavit:

> The March 1992 threat against Professor Trolander inflamed an already tense environment.  I saw numerous employees in tears during that time period, which they reported to me was due to concern over the death threats and fears that someone would randomly open fire on the campus. . . .  The atmosphere was unique in my experience.

Id. at 7 (Affidavit of Lawrence Ianni, ¶ 8).  According to his affidavit, he also felt that a failure to remove the photographs would have a detrimental effect on faculty collegiality.  Id. at 7 (Affidavit of Lawrence Ianni, ¶ 9).

Plaintiffs maintain that Ianni's prediction of potential disruption on campus and detriment to faculty collegiality was illogical.  However, they do not allege, nor does anything in the record suggest, that Ianni had any motive in removing the photographs other than those which he described in his affidavit.  Moreover, in considering the weight to be given Ianni's prediction of disruption, we note that it is now well-established that the anticipated disruption in this context need not be actual, but may be merely potential.  Waters, 114 S. Ct. at 1890 ("the potential disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had"); Tindle, 56 F.3d

at 972 ("[a] showing of actual disruption is not always required in the balancing process under <u>Pickering</u>"); <u>accord</u> <u>Jeffries v. Harleston</u>, 52 F.3d 9, 13 (2d Cir.) (<u>Jeffries</u>) (noting that <u>Waters</u> stresses that actual disruption is not required), <u>cert. denied</u>, 116 S. Ct. 173 (1995).  We also recognize that, in balancing the interests of a public employee against the interests of the government employer in this context, the constitutional standard takes into account proportionality.  "[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before in may be punished. . . .  There is, thus, a proportion between the nature of the speech and the nature of the sanction that may ensue."  <u>Jeffries</u>, 52 F.2d at 13 (citation omitted).  In the present case, Ianni need only have made a minimal showing of potential disruptiveness to justify his actions because Burnham's and Marchese's speech at best only remotely touched upon a matter of public concern (i.e., "the professors' interests in the traditional study of classical and American military history," Brief for Appellees at 34).  <u>Cf.</u> <u>Dunn</u>, 40 F.3d at 292 (message intended to be conveyed by wearing a patch bearing the American flag during the United States' military buildup in the Persian Gulf was "squarely within `the center of public debate'").  In the present case, it is undisputed that violent death threats had been widely publicized on campus less than two months before the photographs were removed from the display case.  It cannot seriously be disputed that, during that spring 1992 semester, the atmosphere on campus was more tense than normal.  Upon <u>de novo</u> review, we have little difficulty holding as a matter of law that the balance of interests tips in favor of Ianni in this particular instance.  As the Supreme Court has clearly stated:

> The key to First Amendment analysis of government employment decisions . . . is this:  The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a

> significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

Waters, 114 S. Ct. at 1888 (emphasis added); accord Jeffries, 52 F.3d at 10 (on remand from the Supreme Court for reconsideration in light of Waters, holding that defendants, university officials, were entitled to judgment as a matter of law on professor's claim that they violated his First Amendment rights by reducing his term as department chair because of derogatory comments he made about Jews in an off-campus speech). In Jeffries, 52 F.3d at 13, the Second Circuit explained:

> Whittled to its core, Waters permits a government employer to fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech.[6]

Accordingly, we hold as a matter of law that Ianni, in ordering the removal of the two photographs from the display case, did not violate Burnham's and Marchese's First Amendment rights to the extent that they were engaging in non-verbal expressive conduct by bearing weapons in their photographs.[7]

_____

[6]On this point, we emphasize that Ianni's actions were directly targeted at the source of the potential disruption and were not in retaliation for the speech.

[7]In support of our holding, we also note the undisputed facts that, following the 1992 summer break, the photographs were posted in the student center on campus and no action was taken at that time because the atmosphere on campus had improved. Appellant's Appendix at 8 (Affidavit of Lawrence Ianni, ¶ 12). These facts further support our conclusion that Ianni, as chancellor of UMD, did not act unreasonably in handling this entire matter. Cf. Piarowski v. Illinois Com. College Dist. 515, 759 F.2d 625, 632 (7th Cir.) ("[t]he discouragement is much less, and hence the abridgment of freedom of expression is less, when the college says

D. Qualified Immunity

We further hold that, even if we were to find that Ianni violated Burnham's and Marchese's First Amendment rights, Ianni may not be held personally liable to pay damages because, under the specific circumstances of the present case, he is protected by qualified immunity.

> [P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. [Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982).] Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. See, e.g., Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions" they took); Davis v. Scherer, 468 U.S. 183, 191 (1984); Harlow v. Fitzgerald, supra, at 819. Cf., e.g., Procunier v. Navarette, 434 U.S. 555, 562 (1978). Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, Harlow [v. Fitzgerald], 457 U.S. at 819, assessed in light of the legal rules that were "clearly established" at the time it was taken, id. at 818.

Anderson v. Creighton, 483 U.S. 635, 638-39 (1987) (citations omitted).

---

. . . you may exhibit your work on campus -- just not in the alcove off the mall"), cert. denied, 474 U.S. 1007 (1985).

In _Anderson v. Creighton_, the Supreme Court addressed the degree of generality versus specificity with which the relevant legal rule is to be defined for purposes of determining whether the law was "clearly established" at the time of the relevant events. _Id._ at 639. The Court explained that, in order for the concept of a "clearly established" law to comport with the "objective legal reasonableness" standard set forth in _Harlow v. Fitzgerald_, 457 U.S. at 819, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." _Anderson v. Creighton_, 483 U.S. at 640. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." _Id._ at 640 (citations omitted).

Needless to say, the very conduct at issue in the present case had not been specifically held unlawful at the time of the relevant events. The pertinent case law in existence at the time Ianni removed the photographs from the display case included the Supreme Court's decisions in _Connick_ and _Pickering_, as well as a body of lower federal court decisions which had applied _Connick_ and _Pickering_ -- none of which were factually similar to the present case. With this in mind, we now ask the question: assuming that Ianni had violated Burnham's and Marchese's First Amendment rights, would that violation have been objectively reasonable, in light of the legal rules that were "clearly established" at the time of his actions? Stated differently, would the assumed unlawfulness have been apparent in light of pre-existing law? _See_ _Anderson v. Creighton_, 483 U.S. at 640.

As discussed above, the _Pickering_ balancing test involves a two-part inquiry: (1) whether the speech is on a matter of public concern, _Connick_, 461 U.S. at 146, and, if so, (2) whether, on balance, the interests of the employee in making the statement

outweigh the interests of the government employer in promoting the efficiency and effectiveness of the public services it performs. Pickering, 391 U.S. at 568. If both criteria have been met, then a First Amendment violation has occurred. In the present case, if we were to find that a First Amendment violation occurred, we would conclude that it was not based upon clearly established law. First, it would not have been clear to an objectively reasonable official that the photographs contained speech on a matter of public concern, even assuming they "expressed and advocated the professors' interests in the traditional study of classical and American military history." Brief for Appellees at 34. As stated above, we think these photographs, which were intended to be informal and humorous visual displays of each professor's individual academic interests, at best only remotely touched upon a matter of public concern. See supra slip op. at 13.

Moreover, at the time Ianni removed the photographs, it would not have been apparent to an objectively reasonable official that Burnham's and Marchese's interests in displaying themselves holding weapons, as a way of demonstrating their individual academic specialties, outweighed UMD's interest in removing the photographs, in an effort to maintain an efficient and effective campus environment. As discussed above, there were numerous competing factors which contributed to Ianni's decision to remove the photographs at that particular time, including the atmosphere of tension and fear on campus resulting from the recent highly publicized death threats and the fact that alternative channels were left open for plaintiffs to convey the same information. See infra slip op. at 20-21.

We believe our qualified immunity analysis is consistent with the current state of qualified immunity jurisprudence as it has evolved in this and other circuits. In Grantham v. Trickey, 21 F.3d 289, 292-95 (8th Cir. 1994) (Grantham), this court thoroughly examined the history of Eighth Circuit case law dealing

-17-

specifically with the applicability of qualified immunity in the public employee speech context.  Implicit in that opinion is the fundamental tenet that the qualified immunity analysis should always be adapted to the specific case at hand.  Id. at 293-95.  In Grantham, 21 F.3d at 295, this court determined that it was appropriate under the circumstances of that case to follow the analysis in Bartlett v. Fisher, 972 F.2d 911 (8th Cir. 1992) (Bartlett).  In Bartlett, 972 F.2d at 916-17, we recognized that, "because Pickering's constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of the Harlow qualified immunity standard."[8]  We agree with this statement as a general proposition, and think that the present case is not an exception.  Qualified immunity is ordinarily a formidable defense to overcome where the

---

[8]A very similar view has been expressed by our court in other constitutional contexts.  For example, in Manzano v. South Dakota Dep't of Social Servs., 60 F.3d 505, 509-11 (8th Cir. 1995), we observed that the constitutionally protected liberty interest which parents have in familial integrity is not absolute, and when a parent alleges that official conduct infringed upon that right, the merits of that constitutional challenge are determined by a balancing test.  We then observed that "[t]he need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome."  Id. at 510. "Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable."  Id. (citing cases).  In Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir. 1987), also a case involving the constitutional right of familial integrity, we applied the doctrine of qualified immunity after noting our agreement with the Seventh Circuit's observation in Benson v. Allphin, 786 F.2d 268, 276 (7th Cir.), cert. denied, 479 U.S. 848 (1986), that, when a determination of constitutional protection turns on application of a balancing test, "the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent."

constitutionality of official conduct is being assessed according to a fact-intensive balancing test.[9]

In sum, we conclude that, even if we were to find that Ianni violated Burnham's and Marchese's First Amendment rights, "officers of reasonable competence could disagree on this issue" and, therefore, "immunity should be recognized." Malley v. Briggs, 475 U.S. at 341. Accordingly, as an alternative basis for our disposition, we hold that Ianni would, in any case, be protected by qualified immunity.

E. The Kohns' First Amendment rights

While Burnham and Marchese were responsible for the expressive conduct that was captured in each of their respective photographs, it was the Kohns who conceived of the idea for the exhibit and who were responsible for placing the photographs in the display case. Therefore, the Kohns have asserted a First Amendment right to use the two photographs as a means "to publicize some of the areas of expertise and interest of the History Department's faculty, while at the same time portraying the faculty in an informal, somewhat

---

[9]Having said this, we are quick to caution that today's holding by no means suggests that qualified immunity will protect public officials in every instance where the applicable constitutional standard involves a balancing test. As plaintiffs point out in their brief, this court has on at least two occasions denied qualified immunity to school officials who violated teachers' First Amendment rights under Pickering. See Southside Pub. Schs. v. Hill, 827 F.2d 270, 272-75 (8th Cir. 1987) (denying qualified immunity to defendants, school officials, who had constructively terminated elementary school teachers in retaliation for having written a letter to the state department of education complaining about violations of the federal statutory requirement that handicapped children be provided a free appropriate public education); Lewis v. Harrison Sch. Dist. No. 1, 805 F.2d 310, 318 (8th Cir. 1986) (qualified immunity denied to school superintendent and school board members who fired school principal for the stated reason, among others, that he had publicly criticized their decision to transfer his wife from the high school to the junior high school level).

humorous way."  Brief for Appellees at 2.[10]  Their claims require a separate analysis.

To begin, we agree with the district court's conclusion that the display case was a nonpublic forum.  Burnham v. Ianni, 899 F. Supp. at 403 (focusing on facts that the display case was under UMD's control, that UMD allowed members of the history club to use it upon request, and that the display case was dedicated to use of the UMD history department for disseminating information about the department).  Because the display case was a nonpublic forum, the issue as to whether the Kohns' First Amendment rights were violated when the two photographs were removed from the display case turns on whether "the distinctions drawn [were] reasonable in light of the purpose served by the forum and [were] viewpoint neutral." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 806 (1985) (Cornelius).  So long as these requirements are met, "[c]ontrol over access to a nonpublic forum can be based on subject matter."  Id.  "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances."  Id. at 809.

We hold that Ianni's decision to remove from the display case the two photographs which depicted professors holding weapons was not an unreasonable subject matter restriction in light of the purpose of the forum, which was to disseminate information about the history department and, additionally, according to plaintiffs, to display items of historical interest.  Brief for Appellees at 4-5.  His actions were narrowly tailored and left open other channels through which the Kohns could still publicize Burnham's and Marchese's interests in classical and American military history.

_____

[10]The Kohns have not alleged that their constitutional rights were violated because the photographs at issue represent a form of artistic expression, either standing alone or as an integral part of the overall exhibit.

See Perry, 460 U.S. at 53 ("the reasonableness of the limitations . . . is also supported by the substantial alternative channels that remain open"). For example, nothing prevented the Kohns from replacing the removed photographs with similar pictures of Burnham and Marchese without weapons, while continuing to publicize through written descriptions their interests in American military and classical history. Moreover, Ianni's actions were reasonable in light of the events of the preceding year, during which two UMD employees, including one professor in the history department, had been the targets of violent threats and efforts to intimidate them by encouraging others to commit acts of violence against them. While plaintiffs emphasize that "neither plaintiffs nor their pictures had anything whatsoever to do with [the threats against Featherman and Trolander]," Brief for Appellees at 17, the law does not require Ianni to prove such a correlation. "[A] finding of strict incompatibility between the nature of the speech . . . and the functioning of the nonpublic forum is not mandated." Cornelius, 473 U.S. at 808.

Finally, notwithstanding our failure to discern any viewpoint from the exhibition of photographs which purportedly projected the interests of Burnham and Marchese in American military and classical history, Ianni has demonstrated beyond any dispute that his removal of the photographs had nothing whatsoever to do with those matters. As discussed above, he was motivated solely by the potential disruptiveness of the photographs. On this point, we note the district court's emphasis on its conclusion that the suppression was "content-based." Burnham v. Ianni, 899 F. Supp. at 403-04. However, the current constitutional standard in nonpublic forum cases does not focus solely on whether the suppression was content-based but, rather, turns on whether the suppression was reasonable and viewpoint-neutral.

In sum, we hold as a matter of law that Ianni did not violate the Kohns' First Amendment rights when he had removed from the

-21-

display case two photographs depicting what he reasonably considered to be potentially disruptive and, therefore, inappropriate subject matter. Furthermore, even if we were to conclude that Ianni violated the Kohns' First Amendment rights, we would in any case hold that Ianni is shielded by qualified immunity from liability for damages because "officers of reasonable competence could disagree on this issue" and, therefore, "immunity should be recognized." Malley v. Briggs, 475 U.S. at 341.

### III. Conclusion

For the forgoing reasons, we hold as a matter of law that Ianni did not violate any of plaintiffs' First Amendment rights. We further hold, in the alternative, that, even if Ianni did violate any of plaintiffs' First Amendment rights, he is protected by qualified immunity. Accordingly, the order of the district court denying Ianni's motion for summary judgment is reversed and the case is remanded to the district court with instructions to enter judgment for Ianni.

BEAM, Circuit Judge, dissenting.

Under this opinion of the court, the plaintiffs/appellees can burn an American flag outside the University history department, Texas v. Johnson, 491 U.S. 397 (1989), but cannot advance, as students and members of the history faculty, expressive conduct intended to support and publicize areas of teaching expertise and special interest within the department. This content-based suppression was clearly not an act by the University chancellor that properly balanced free speech against work place tranquility. It was, rather, as aptly stated by the district court, unvarnished censorship. The court's opinion is not a demonstration of legitimate First Amendment jurisprudence but is, rather, an example of the triumph of the political correctness agenda of three or four

campus personalities over well-established free speech rights of students and faculty.  From this result, I dissent.

## I.  FACTS

The court sets forth what it calls "underlying facts" that are "generally not in dispute." Supra at 2.  The opinion omits, however, other "undisputed" facts of importance to the case and several disputed material facts as well.  Since this matter is before the court on motion for summary judgment[11] based on a claim of qualified immunity, the court "ordinarily must look at the record in the light most favorable to the party [plaintiffs/appellees] opposing the motion, drawing all inferences most favorable to that party." Harlow v. Fitzgerald, 457 U.S. 800, 816 n.26 (1982).  With this requirement in mind, a more complete recitation of the facts, some of them perhaps disputable at trial, based upon the affidavits in the record as  annotated in the appellees' brief, is necessary.

Plaintiff Burnham has been a part-time professorial member of the history department at the University of Minnesota-Duluth (UMD) since 1986.  He holds a Ph.D. and his special expertise is United States history, particularly military history.

Plaintiff Marchese is a tenured professor in the University of Minnesota system.  He is a professor of humanities, classics and history at UMD and a professor of ancient history and archaeology in the Center for Ancient Studies at the University of Minnesota-Minneapolis.

---

[11]It does not appear that discovery of any kind has been conducted in this case.  Apparently all facts are advanced through plaintiffs' pleadings and affidavits submitted by the parties.

The History Club, active for a number of years on campus, operates under the auspices of the UMD history department.  At all relevant times, Professor Burnham was faculty advisor to the Club.

During the fall quarter of 1991, two student members of the History Club, plaintiffs Michael and Louise Kohn, conceived an idea for a project that was intended to publicize some of the areas of expertise and interest of the history department's faculty, while at the same time portraying the faculty in an informal, somewhat humorous way.  The Kohns approached Professors Burnham and Marchese as well as other members of the department, all of whom agreed to participate.  They agreed to pose for a picture with a "prop" that related to their areas of interest.  They also agreed to supply information about their areas of interest, their academic background, their historical heroes, and to supply a quotation to be used along with the above information and their photographs.

For his photograph, Professor Marchese elected to pose with an ancient Roman short sword while wearing a cardboard laurel wreath.  He listed his specialties as "Ancient Greece and Rome, Homeric Literature" and identified Homer and Alexander the Great as historical heroes.  He chose to pose with the Roman sword for two reasons.  First, he likes to use tangible objects in his lectures, and he had previously used the sword in that way.  Second, one of his interests is military history.  He believes that a thorough knowledge of the ancient world must include an appreciation for the military culture and techniques that allowed Rome to gain and hold an ascendancy over the Mediterranean world.  His courses on ancient history include far more than military history, but he thinks that military history is an important aspect of that era.  Hence he believed the Roman sword was an appropriate "prop" for his photograph.

Professor Burnham's special interest in American history includes military history in particular.  Among the historical

heroes he listed were John Adams and Davy Crockett.  Consistent with his professional interests, he posed with a .45 caliber military pistol, wearing a coonskin cap.

A total of eleven professors posed for or supplied pictures. The Kohns assembled an exhibit that incorporated these photographs along with the written comments submitted by each faculty member.

The photographs and the accompanying written material comprising the exhibit communicated something of considerable public interest.  The exhibit was intended to be viewed by students and prospective students, as well as any members of the public who might be on the premises.  Its purpose was to inform students and prospective students about the interests and areas of expertise of the professors in the department.  It was also intended to communicate information about the professors and their attitudes toward history--as reflected, for example, in their choices of historical heroes.

The exhibit was put up in the history department's display case, located in the public corridor next to the classrooms used by the department, on March 27, 1992.  This display case is designed to hold material that communicates ideas to the public.  The case and its contents are seen by students who are taking classes located in the vicinity, by faculty members, and by members of the general public.  The display case is reserved for the use of the history department.  The plaintiffs allege that the case has contained, for a number of years, an exhibit on Roman siege warfare equipment that was assembled by Professor Marchese.  The case has been used by members of the History Club as well as by the history department faculty.  The case is used only to communicate matters that are considered to be of public interest.  It is not used for private communications, like a mailbox or a message system.

The exhibit was observed by hundreds if not thousands of people. Members of the department received many compliments on the presentation, as did the students who assembled it. For two weeks no one expressed any criticism of the exhibit. The display appeared to make a contribution to morale and good relations within the department itself.

On April 10, 1992, Judith Karon (who was then UMD's affirmative action officer) and UMD Police Captain Harry Michalicek came to the history department and viewed the exhibit. It was subsequently learned that this was in response to a complaint by Charlotte Macleod, an assistant professor who was the head of the UMD Commission on Women. Karon went to the departmental secretary, Elizabeth Kwapick, and demanded that the pictures of Professors Burnham and Marchese be removed. This demand was denied by the department.

Professor Burnham called a lawyer in the University of Minnesota's Legal Department, who told him that she could find nothing wrong with the display as described. The history department agreed that the department should resist any attempt by the administration to censor the photographs, and the department declined to remove them.

On April 27, 1992, Karon sent a memorandum to the Dean of the College of Liberal Arts, John Red Horse, stating that she expected the photos to be removed immediately because she found them to be "totally inappropriate." Dean Red Horse apparently refused to act on Karon's request. On April 30, 1992, Karon sent Professor Burnham a memorandum explaining her reasons for wanting to censor the photographs of Professors Burnham and Marchese. In her memorandum, Karon again stated that she ordered the exhibit censored because she found the photographs "insensitive" and "inappropriate."

On the morning of April 29, 1992, Louise Kohn, Michael Kohn, Elizabeth Kwapick and Professor Burnham met with UMD Chancellor Lawrence Ianni to explain the display and protest Karon's attempted censorship of the pictures and the students' work. During that meeting, Chancellor Ianni said that he personally found nothing wrong with the photographs.

On the afternoon of the same day, the history department held a meeting on this issue, which was also attended by Ianni, Karon, and Dean Red Horse. During that meeting, Chancellor Ianni again stated that he personally saw nothing wrong with the photographs, but hinted that he nevertheless might support their removal.

When asked to explain why she wanted the pictures censored, Karon tried to tie them in with a written threat against Professor Judith Trolander and other members of the department, which had been found on March 16, 1992. Members of the department told Karon that they thought her attempt to link the pictures to this deranged threat was absurd. (Plaintiffs allege that Professor Trolander had not initially been offended in any way by the pictures, in fact, she participated in the project by posing for a photograph and specifying her specialties, a personal quotation and historical heroes. On the day it was put up she said that she thought the display was "very nice.") Karon also stated at that meeting that she considered the photographs to constitute sexual harassment. She was unable to explain what she meant by this. Karon was asked by what authority she could order the removal of a student departmental display, and she was not able to give any satisfactory answer.

On May 4, 1992, Chancellor Ianni ordered UMD Plant Services Director Kirk Johnson to remove the pictures of Professors Burnham and Marchese, but he reported he was unable to obtain access. Ianni then ordered UMD police to remove the photos, and the next day, UMD Police Captain Michalicek went to the history department

-27-

and removed the photographs. The photographs were apparently given to Karon, who locked them up. Ultimately, through the efforts of Captain Michalicek, they were returned to Michael and Louise Kohn. Only the two photographs with weapons were removed. The other nine photographs remained on display. Professors Burnham and Marchese then removed the balance of their contributions to the display.

## II. DISCUSSION

The court's opinion concedes as it must that the censored presentation at issue was constitutionally protected free speech. See, e.g., Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 505-06 (1969); Tindle v. Caudell, 56 F.3d 966, 969 (8th Cir. 1995). And, "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker, 393 U.S. at 506. Indeed, the idea that a faculty member can be compelled to relinquish First Amendment rights in connection with employment at a public school has been "unequivocally rejected." Pickering v. Board of Educ., 391 U.S. 563, 568 (1968).

### A. Pickering Balancing

The court contends, however, that the right to express this particular free speech must be balanced by the state employer's right to content suppression in the name of work place efficiency and harmony. It then employs a line of wholly inapposite employee discipline and termination cases to summarily dispose of the violation of the faculty members' First Amendment rights. See, e.g., Pickering, 391 U.S. 563 (teacher discharged for letter written to newspaper criticizing school board and school superintendent); Connick v. Myers, 461 U.S. 138 (1983) (assistant district attorney discharged for distributing questionnaire concerning office morale and policy and confidence in supervisors); Waters v. Churchill, 114 S. Ct. 1878, 1887 (1994) (nurse discharged

over statements dealing with hospital working conditions); and _Tindle_, 56 F.3d 966 (police officer suspended for attending Fraternal Order of Police party wearing blackened face, bib overalls, black curly wig and carrying watermelon).

These cases are inapplicable for at least two reasons. The speech at issue in _Pickering_, _Connick_ and _Waters_ was directly critical of the efficiency and operations of the employers' business. In _Tindle_ there was evidence that the conduct (although indirect in presentation) directly led to racial friction and disharmony within the Little Rock Police Department, thus affecting work place morale and efficiency. Here the speech was essentially supportive of University operations, extolling the capabilities and interests of certain faculty members. Contrary to the conduct in _Tindle_, the photographs of Burnham and Marchese were not presumptively divisive, even in the ambiance of the threats detailed by the court, nor were they shown to have been a palpable threat to work place morale, efficiency or harmony.

There was also no adverse employment action against which a free speech right might be balanced. When put to the test on this misuse of precedent, the court curiously explains, _supra_ at 11 n.5, that the censorship itself is somehow the adverse employment action. Turning to _Tindle_, a case mightily relied upon by the court, an apt analogy, considering this argument, would be for the police to have seized Tindle's bib overalls, black curly wig and his watermelon and called it an adverse employment action. The adverse employment action was, of course, the officer's suspension.[12]

---

[12]_Tindle_ is inapposite for an additional reason. It involves a police department which, as pointed out by Judge Loken in _Bartlett v. Fisher_, 972 F.2d 911 (8th Cir. 1992), "as a paramilitary force, should be accorded much wider latitude than the normal government employer in dealing with dissension within its ranks." _Id._ at 918. (See further discussion _infra_ at 34). The more apposite case, unmentioned by the court, is _Kincade v. City of Blue Springs, Missouri_, 64 F.3d 389 (8th Cir. 1995), _cert. denied_, 116 S. Ct. 1565 (1996), a matter that is factually on point with this action and arrives at a contrary conclusion. (See further discussion _infra_ at 34-35).

Even if this "square peg in round hole" approach by the court were to have any validity at all, which it does not, it would fail on the facts.

I do not believe that an employer must unreasonably endure dissident and offensive speech without recourse simply because of the First Amendment. As noted in <u>Waters</u>, however, the government employer must make a substantial showing that the speech is, in fact, disruptive before it may be punished. <u>Waters</u>, 114 S. Ct. at 1887. I concede the court's point that a government, as an employer, has broader powers in suppressing free speech than a government as a sovereign. I further concede that we have given some deference to an employer's predictions of work place disruption. <u>Id.</u> We have never given, however, and indeed we have rejected, any deference to a government supervisor's bald assertions of harm, especially those, as here, that are based on conclusory hearsay and rank speculation.[13] Recently we observed that "it is critical to determine whether the defendants [employers] have put the <u>Pickering</u> balancing test at issue by producing evidence that the speech activity had an adverse effect on the efficiency of the . . . employer's operations." <u>Grantham v. Trickey</u>, 21 F.3d 289, 294 (8th Cir. 1994). We have noted that "[a] public employee's exercise of free speech rights affects the

---

[13]The factual differences between this case and <u>Tindle</u> are dramatic. Undisputed evidence was presented in <u>Tindle</u> showing that racial divisiveness existed prior to the incident in question sufficient to cause the police department to hire an individual to conduct "prejudice reduction workshops;" that several African-American officers resigned from the Fraternal Order of Police over the incident; that Tindle's conduct violated a department rule; and that Tindle admitted that his acts had "humiliated and offended a number of African-American [police] officers." <u>Tindle</u>, 56 F.3d at 968. Here, there was no showing even remotely approaching these proportions. Indeed, only two people, for certain, Karon and Macleod, were critical of the display and the basis for their criticism had little, if anything, to do with the ongoing efficiency and effectiveness of the educational operation at UMD.

efficiency of the operation of the public service when [the evidence shows that] it affects the morale of the work force and damages the program's reputation."  Id. at 295.  This is a burden that falls upon the employer. For instance, the Supreme Court, in Pickering, noted that "no evidence to support [professional damage to the school board and superintendent] was introduced at the hearing" and rejected the work place disruption argument of the board.  Pickering, 391 U.S. at 570.

Part II(C) of the court's opinion, which attempts to address Burnham and Marchese's First Amendment rights, is a salmagundi of erroneous arguments and conclusions that are difficult to respond to in a concise and orderly fashion.  The "mix and match" character of the opinion results from the court's need to respond to an act of "politically correct" censorship  searching for a lawful rationale--after the fact.  Properly analyzed, Ianni's position is simply not defensible.

As conceded by the court, the Pickering/Connick balancing test, if at all applicable, which it is not, requires the court to determine whether the professors' free speech rights "outweigh the interests of [UMD] in promoting the efficiency and effectiveness of the public services it performs," supra at 17, here the educational mission of the University.  Unfortunately, the court, at best, pursues an apples and oranges approach.  It seems to attempt to balance the free speech rights against, on the one hand, a purported campus "atmosphere of tension and fear," supra at 17, and on the other hand, but only peripherally and obliquely, the disruption of the pedagogical mission of UMD.  Because we are dealing with summary judgment rather than the results of a trial, we note that the impact of the free speech on the campus's atmosphere, if any, is hotly disputed.  Its impact upon the educational mission of UMD is totally unproven and unaddressed except in the most conclusory fashion.

-31-

Of course, there is really no evidence that the offending photographs actually impacted the campus atmosphere at all. The best that can be said for the court's extensive discussion of the alleged threats to Ms. Featherman and Ms. Trolander, see supra at 3-4, is that some campus milieu may have been created by acts that occurred in June of 1991 and early March of 1992, acts preceding the erection of the display. Obviously, the then non-existent photographs had no effect upon the environment created by these incidents. Indeed, Ianni's memo of March 16, 1992, purportedly dealing with these threats, preceded the March 27, 1992, posting of the display. And, although the affidavits of both Burnham and Marchese expressly discount and deny that a "climate of fear" existed on campus, clearly placing the "atmosphere" issue in dispute for summary judgment purposes, see Burnham Affidavit Appellees' App. at 17 and Marchese Affidavit Appellees' App. at 27, it is obvious that the photographs had nothing to do with the campus ambiance that existed at the time of Ianni's March 16 memo. Thus, the test, flunked by Ianni so far, is what effect, if any, did the photographs have on University functions. The present record leaves this question unanswered.

Even if, for the sake of argument, I were to concede the existence of pre-existing campus tension arising from the Featherman and Trolander episodes, there is absolutely no evidence, except for Ianni's sweeping conclusions, that establishes a nexus between the two photographs and an exacerbated atmosphere of fear on the campus or, more importantly, that establishes a relationship, direct or indirect, between the photographs and the "efficiency and effectiveness" of UMD's mission in public education. Evidence that the photographs increased campus-wide tension which in turn diminished the efficiency of the mission of UMD is totally absent, not just in dispute, although even a dispute

-33-

of fact would doom a grant of summary judgment for Ianni on the basic First Amendment issue.

Additionally, qualified immunity, the issue that gives this court jurisdiction to review the district court's denial of summary judgment, is an affirmative defense that Ianni must assert. Siegert v. Gilley, 500 U.S. 226, 231 (1991). Thus, Ianni had the burden of proving, Watertown Equip. Co. v. Northwest Bank Watertown, 830 F.2d 1487, 1490 (8th Cir. 1987), cert. denied, 486 U.S. 1001 (1988), that the constitutional right asserted by the plaintiffs was not clearly established at the time of the incident or if established, was not discernible to an objective government official under the facts available or, in the alternative, of proving the "necessary concomitant" that plaintiffs have not asserted "a violation of a constitutional right at all." Siegert, 500 U.S. at 232. It is the alternative inquiry that the court primarily relies upon today, i.e., is there a constitutional violation at all? As I have noted, Ianni has simply not shouldered his burden of proof as to this prong of qualified immunity jurisprudence or, at the very least, he has left a factual inquiry on this issue on the table to be fleshed out at a trial.[14]

The court's secondary attempt to pump air into its reversal balloon, through a finding of qualified immunity enforceable through summary judgment, quickly deflates with the failure of proof on the basic Pickering/Connick issue. Beyond that, however,

---

[14]While our cases frame this alternative inquiry as one leading to a determination of qualified immunity, the procedure actually tests whether a viable claim for relief has been stated under 42 U.S.C. § 1983. Ordinarily, denial of a motion for failure to state a claim is interlocutory and unappealable. When coupled with an affirmative defense of qualified immunity, however, the "failure to state a claim" issue becomes appealable under the rationale set forth in Siegert. In my view, if a constitutional right has not been asserted "at all," a defendant has no need for immunity. Siegert, 500 U.S. at 232. The case should simply be dismissed for the lack of a workable claim. Conceptually, immunity is only needed to protect a government actor from suit if an actual constitutional violation has occurred.

the court advances a new and surprising theory that whenever a _Pickering/Connick_ balancing test is required, government officials

must always be awarded qualified immunity. <u>Supra</u> at 18-19.[15] Although it admits the existence of several cases contrary to its theory, <u>see</u> <u>supra</u> at 19 n.9, the court fails to cite the most analogous case, <u>Kincade v. City of Blue Springs, Missouri</u>, 64 F.3d 389 (8th Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 1565 (1996), even though a member of the panel majority joined that opinion.

Kincade was discharged by Blue Springs for exercising his free speech rights. Because Kincade's speech touched on a matter of public concern, as does the speech in this case, the <u>Pickering/Connick</u> balancing test was employed to review a district court denial of a motion for summary judgment on qualified immunity grounds. The court, noting that the only evidence of workplace disruption was a conclusory statement to that effect by the mayor and other city officials, asserted:

> the Appellants [city officials] have merely asserted that Kincade's speech adversely affected the efficiency of the City's operations and substantially disrupted the work environment without presenting any specific evidence to support this assertion. They therefore have not put the <u>Pickering</u> balancing test at issue, and accordingly, we reject their claim that they are entitled to qualified immunity because free speech questions for public employees, as a matter of law, cannot be "clearly established."

---

[15]The cases cited by the court exclusively involve police and paramilitary employers that this circuit has treated differently than general governmental bodies, schools and colleges, especially where, as here, elements of academic freedom are present. We have held that paramilitary employers have a heightened interest in regulating the speech of its employees to promote loyalty, obedience in the ranks and public confidence in the units. <u>See</u>, <u>e.g.</u>, <u>Bartlett v. Fisher</u>, 972 F.2d 911, 918 (8th Cir. 1992) (noting paramilitary government employer "should be accorded much wider latitude than the normal government employer in dealing with dissension within its ranks").

Kincade, 64 F.2d at 398-99. This is precisely the factual and legal situation we have in this case and the court's opinion clearly violates the precedent established in Kincade.

Admittedly in different contexts, two recent cases generally dramatize the burden of proof allocation when free speech is at issue. In 44 Liquormart, Inc. v. Rhode Island, 116 S. Ct. 1495 (1996), decided this past term, a case involving commercial advertising, a commodity recognized as more freely subject to regulation than other forms of protected speech, id. at 1504, the Supreme Court rejected the premise that the merchant/advertiser had the burden of disproving Rhode Island's stated reason for the speech regulation, to-wit: the promotion of temperance by the reduction of alcohol consumption. The Court, rejecting even a presumption in favor of the state arising from the Twenty-first Amendment said:

> [W]e note that a commercial speech regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. For that reason, the State bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so to a material degree. The need for the State to make such a showing is particularly great given the drastic nature of its chosen means--the wholesale suppression of truthful, nonmisleading information.

Id. at 1509 (citations and internal quotations omitted). The Court, here, affirms the wholesale suppression of truthful, nonmisleading free speech, of a higher order than liquor advertising upon Ianni's self-serving, factually unsupported, subjective state of mind that the censorship might "maintain a positive and efficient working and learning environment conducive to the mission of an academic institution." Supra at 12.

In an even more recent case, <u>Forbes v. Arkansas Educ.</u>
<u>Television Comm'n</u>, No. 95-2722, slip op. (8th Cir. Aug. 21, 1996),

in an opinion concurred in by the majority members of this panel, in litigation in which a minor candidate was excluded from a televised debate because a government functionary thought he was not a "viable" candidate, this court said, "We hold that a governmentally owned and controlled television station may not exclude a candidate, legally qualified under state law, from a debate [free speech] organized by it [the television station] on such a subjective [lack of viability] ground.  To uphold such a defense would, in our view, place too much faith in government." Id. at 3.  The same goes for the subjective suppression advanced here.  In sum, the court's holding that "Ianni need only [make] a minimal showing of potential disruptiveness to justify his actions," supra at 13, is simply an incorrect statement of First Amendment law.

Giving the best gloss possible to the facts adduced by Ianni, nothing remotely approaching lower morale and program damage at UMD was established.  The censorship itself did more damage to the morale of the history department than any other possible event except, perhaps, the announcement of a budget cut.  Viewing the competing affidavits favorably to Burnham and Marchese, as we must at this summary judgment juncture, we find only three or four people in support of censorship and none of them offering objections or reasons running directly to institutional morale or program damage.  As stated earlier, Judith Karon, at the time UMD's affirmative action officer, thought the display was "insensitive and inappropriate."  She later thought the photographs might somehow constitute "sexual harassment."  Professor Trolander, a member of the history department faculty, at first thought the displays were "very nice" but later, apparently, thought the display was inappropriate.  The other offended individual revealed in the record was Charlotte Macleod, the original complainant, an assistant professor at UMD and the head of the UMD Commission on

Women.  Without derogation of the strong feelings of these three individuals, their states of mind are not reason enough to allow

the University administration to run roughshod over the First Amendment rights of Burnham and Marchese.

Finally, the court notes, <u>supra</u> at 14 n.7, that later in 1992, copies of the photographs censored by Ianni were posted at the student center on campus without complaint of any kind and without any evidence of an institutional breakdown.[16] Far from proof of the propriety of Ianni's earlier censorship, as the court contends, this is evidence that there never could have been a showing of work place disruption. Free speech is free speech whether it occurs in May in the history display case or in August at the campus student center.

The facts fail to support Ianni's position, and the district court so found. Judge Davis stated "[t]his is not an employment case where there is a threatened disruption to the efficient delivery of services." <u>Burnham v. Ianni</u>, No. 594-6, mem. op. at 9 (D. Minn. Mar. 17, 1995). The court, in its summary judgment, fact-finding exercise, seems to have found this holding to be clearly erroneous. It is, however, the court that is in error.

### B. Content Suppression

The most troublesome aspect of the court's opinion is its failure to properly analyze the real free speech/censorship issues

---

[16]The court excuses this inconsistent position by reference to an "improved" atmosphere. <u>Supra</u> at 14 n.7. I find no support in reason or precedent for such a rationale. The plaintiffs point out in their brief that UMD students recognized the censorship even if Ianni and Karon did not. The student center display was, apparently, on the subject of censorship and was headed "The Administration Does Not Want You to See These." The second showing argument advanced by Ianni and accepted by the court was characterized by Judge Davis as "at best, disingenuous." <u>Burnham v. Ianni</u>, No. 594-6, mem. op. at 12 (D. Minn. Mar. 17, 1995).

brought clearly into focus in this case.   These are the issues
summarily, and incorrectly, disposed of by the court in Part II(E)

under the heading "The Kohns' First Amendment rights."  <u>Supra</u> at 19.  The violation involved all four plaintiffs' First Amendment rights and not just those of the students.

The court discusses the nature of the forum, an irrelevant matter.  Even so, its conclusion is wrong.  Under the facts of this action, the display case was clearly a limited designated forum, <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983).[17]  <u>See also</u> <u>Forbes</u>, slip op. at 3.  Thus, the content-based suppression at work here must have served a compelling state interest through censorship narrowly drawn to serve that interest. <u>Widmar v. Vincent</u>, 454 U.S. 263, 270 (1981).  No such test was applied in this case by either Ianni or the court and no such showing could possibly have been made under the <u>undisputed</u> facts of this litigation.

At the bottom line, however, the nature of the forum makes little difference.  Even if the display case represented a closed forum, Ianni violated the First Amendment rights of the plaintiffs, and in a way that any objective University chancellor would or should have known.

We need look no further than <u>Tinker v. Des Moines Independent Community School District</u>, 393 U.S. 503, for controlling precedent although the answer is so fundamental it governs dozens of cases decided in this circuit alone.  In <u>Tinker</u>, of course, three students, ages sixteen, fifteen and thirteen, wore black armbands

---

[17]The display case, as earlier noted, was in the hall outside the history department's classrooms and had been placed there to hold information about the department, the faculty and students for the benefit of students, prospective students and the public. Displays in the case were designated and intended to communicate truthful, nonmisleading ideas to students, prospective students, faculty and the public on a permanent, ongoing basis.

during attendance at their respective Des Moines senior and junior high schools to publicize their objections to the Vietnam War.  A

few students made hostile remarks to the students wearing armbands but there were no threats or acts of violence on school premises. Id. at 508. The school authorities were found by the district court to have acted reasonably in prohibiting the armbands "because [the action] was based upon [the school's] fear of a disturbance from the wearing of the armbands." Id.

The Supreme Court rejected this conclusion saying "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Id. The Court further noted that "[i]n our system, state-operated schools may not be enclaves of totalitarianism." Id. at 511. Freedom of expression may be regulated only with a specific showing of a constitutionally valid reason. Id. There had to be a factual showing that the suppressed conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." Id. at 509.

As in Tinker, there is no such showing made here by Ianni. The after-the-act recitation of outside threats made against a faculty member and a UMD administrator, with no shown or known connection to the history department display, is simply a "red herring" drawn across the trail leading from the University chancellor's suite, via the affirmative action officer's quarters, to the unconstitutional censorship of two photographs totally unrelated to the purported concern. The argument that a photograph of a male, laurel-wreath bedecked UMD faculty member holding a Roman short sword, as part of a eleven-person faculty display, somehow exacerbated or threatened to exacerbate a purported, but unproven, atmosphere of fear on the UMD campus is almost laughable. There was no valid constitutional basis for the censorship, it was simply an act of regulation of what Karon believed to be politically incorrect speech, a display of weapons.

**III. CONCLUSION**

Followed to its logical conclusion, the court's holding simply permits the suppression of too much speech on arbitrary and capricious grounds. Indeed, the opinion would even permit suppression of Sandra Featherman's advocacy of gender and cultural diversity at UMD if Chancellor Ianni subjectively felt that such speech contributed to an inefficient and negative working and learning environment on the campus because of unlawful or vehement, but protected, opposition to Featherman's views. Surely that cannot be the law in this circuit.

Further, the court grants the motion for summary judgment based upon qualified immunity because it finds no First Amendment violation. The court improperly limits the facts it considers, mistakenly applies a <u>Pickering/Connick</u> balancing test and accepts self-serving statements by Ianni, unsupported by evidence except evidence of the political correctness concerns of two faculty members and an affirmative action administrator. This is error. I dissent.


A true copy.

Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-49-