United States Court of Appeals

FOR THE EIGHTH CIRCUIT

_____

No. 95-1962

_____

Albert Burnham; Ronald            *
Marchese; Michael Kohn;           *
Louise Kohn,                      *
                                  *
        Appellees,                *
                                  *  Appeal from the United States
    v.                            *  District Court for the District
                                  *  of Minnesota.
Lawrence Ianni, in his            *
official capacity as              *
Chancellor of the University      *
of Minnesota at Duluth and        *
in his individual capacity,       *
                                  *
        Appellant.                *

_____

Submitted:  January 14, 1997

Filed: July 11, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, McMILLIAN, JOHN R. GIBSON, FAGG,
    BOWMAN, WOLLMAN, BEAM, LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD,
    Circuit Judges, en banc.

_____

BEAM, Circuit Judge.

In this section 1983 action, Chancellor Lawrence Ianni appeals from
the district court's[1] denial of his motion for summary judgment based on
qualified immunity.  A panel of this court reversed.  Our decision to grant
en banc review vacated that

_____

[1]The Honorable Michael J. Davis, United States District Court
Judge for the District of Minnesota.

decision.  See Burnham v. Ianni, 98 F.3d 1007 (8th Cir. 1996).  We now affirm.

## I.  BACKGROUND

Because discovery has not been conducted in this case, the  facts are derived from the plaintiffs' pleadings and the affidavits submitted by the parties.  Plaintiff Albert Burnham has been a part-time professor in the history department at the University of Minnesota-Duluth (UMD) since 1986.  Plaintiff Ronald Marchese is a tenured professor in the University of Minnesota system.  He is a professor of humanities, classics and history at UMD and a professor of ancient history and archaeology in the Center for Ancient Studies at the University of Minnesota-Minneapolis.  The History Club, active for a number of years on campus, operates under the auspices of the UMD history department.  At all relevant times, Professor Burnham was the faculty advisor to the Club.

During the fall quarter of 1991, two student members of the History Club, plaintiffs Michael and Louise Kohn,[2] conceived an idea for a project that was intended to publicize some of the areas of expertise and interest of the history department's faculty, while at the same time portraying the instructors in an informal, somewhat humorous way.  The Kohns approached Professors Burnham and Marchese as well as other members of the department, all of whom agreed to participate.  They agreed to pose for a picture with a "prop" that related to their areas of interest.  They also supplied information about their fields of expertise, academic background, and historical heroes, as well as a quotation to be used along with the above information and their photographs.

---

[2]The Kohns have now graduated from UMD.

For his photograph, Professor Burnham posed with a .45 caliber military pistol, wearing a coonskin cap. His special interest in American history includes military history in particular. He listed John Adams and Davy Crockett among his historical heroes. Consistent with his professional interests, Professor Marchese elected to hold an ancient Roman short sword while wearing a cardboard laurel wreath. He listed his specialties as "Ancient Greece and Rome, Homeric Literature" and identified Homer and Alexander the Great as his historical heroes.

A total of eleven professors posed for or supplied pictures. The Kohns assembled an exhibit that incorporated these photographs along with the written comments submitted by each faculty member. The photographs and the accompanying written material were thought to communicate matters of public interest.[3] The exhibit was

---

[3]The debate over how to present history in our nation's schools has been a topic of public concern for some time. Indeed, it has been the subject of numerous books, law reviews and newspaper articles. See, e.g., Stephen E. Gottlieb, In the Name of Patriotism: The Constitutionality of 'Bending' History in Public Secondary Schools, 62 N.Y.U.L. Rev. 497 (June 1987) (compiling authorities). In 1994, this nationwide concern resulted in the release of a national curriculum guidebook which was widely criticized as bowing to political correctness to the detriment of offering students an accurate account of United States history. See Connie Cass, History Standards Criticized as Too Politically Correct, 1994 WL 10105333 (1994). The most widely criticized aspect of the guidebook was its downplaying of historical heroes, to the exclusion of persons such as Thomas Edison, Paul Revere and Robert E. Lee. Id. Although a revised guidebook emerged in 1996, it too caused quite a stir. See Elizabeth Martinez, A New Way of Looking At Our U.S. Origin Myth, 1996 WL 2163654 (1996). Regardless of the current status of a proposed national guidebook, however, the debate over how to teach history is alive and well. As one author recently stated:

> One cannot study history without an appreciation of the conflicts it contains both among the actors in the past and among the historians of the present. The idea that history can be taught as a set of names and dates or that science can be taught as a set of formulas is as distasteful to students as to those with any knowledge of the disciplines. Yet, if one is to get beyond the level

intended to be viewed by students and prospective students, as well as any members of the public who might be on the premises. It was designed to impart information about the professors and their attitudes toward history--as reflected, for example, in their choices of historical heroes.

The exhibit was put up in the history department's display case, located in the public corridor next to the classrooms used by the department, on March 27, 1992. The case and its contents are seen by students taking classes nearby, faculty members, and members of the general public. The display case is reserved for the use of the history department. It has contained, for a number of years, an exhibit on Roman siege warfare equipment that was assembled by Professor Marchese. The device has been used by members of the History Club as well as by the history department faculty. The case is used only to communicate matters that are considered to be of general interest. It is not used for private communications, like a mailbox or a message system.

The exhibit was, in fact, observed by hundreds, if not thousands, of people. Members of the department received many compliments on the presentation, as did the students who assembled it. For two weeks, no one expressed any criticism about the exhibit. To the contrary, the display appeared to contribute to morale and good relations within the department.

---

of names and dates, one dwells in a realm of disputed ideas.

Gottlieb, 62 N.Y.U.L. Rev. at 573 (footnote omitted).

On April 10, 1992, Judith Karon, who was then UMD's affirmative action officer, and UMD Police Captain Harry Michalicek came to the history department and viewed the exhibit. This was in response to a complaint by Charlotte Macleod, an assistant professor who was the head of the UMD Commission on Women. Karon went to the departmental secretary, Elizabeth Kwapick, and demanded that the pictures of Professors Burnham and Marchese be removed. The department denied this demand.

Upon hearing of this attempt to remove the pictures, Professor Burnham called a lawyer in the University of Minnesota's Legal Department, who told him that she could find nothing wrong with the display as described. The history department agreed that the department should resist any attempt by the administration to censor the photographs, and the department declined to remove them.

On April 27, 1992, Karon sent a memorandum to the Dean of the College of Liberal Arts, John Red Horse, stating that she expected the pictures to be removed immediately because she found them to be "totally inappropriate." Dean Red Horse apparently refused to act on Karon's request. On April 30, 1992, Karon sent Professor Burnham a memorandum explaining her reasons for wanting to remove the photographs of Professors Burnham and Marchese. In her memorandum, Karon again stated that she ordered the exhibit taken down because she found the photographs "insensitive" and "inappropriate."

On the morning of April 29, 1992, Louise Kohn, Michael Kohn, Elizabeth Kwapick and Professor Burnham met with Chancellor Ianni to explain the display and protest Karon's attempted censorship of the pictures and the students' work. During that meeting, Ianni said that he personally found nothing wrong with the photographs. On the afternoon of the same day, the history department held a

meeting on this issue, which was also attended by Ianni, Karon, and Red Horse. During that meeting, Chancellor Ianni again stated that he personally saw nothing wrong with the photographs, but hinted that he might nevertheless support their removal.

When asked to explain why she wanted the photographs removed, Karon tried to connect them to a written threat against Professor Judith Trolander which had been found on March 16, 1992.[4] Members of the department told Karon that they thought her attempt to link the pictures to this deranged message was absurd. Karon also stated that she considered the photographs to constitute sexual harassment. She was unable to explain what she meant by this. She was also unable to state by what authority she could order the removal of a student departmental display.

On May 4, 1992, Chancellor Ianni ordered UMD Plant Services Director Kirk Johnson to remove the pictures of Professors Burnham and Marchese. Because Johnson was unable to obtain access to the pictures at that time, Ianni ordered the UMD police to remove the photos. The next day, UMD Police Captain Michalicek removed the photographs from the display. Only the two photographs with weapons were removed. The other nine photographs remained on display. Professors Burnham and Marchese then removed the balance of their contributions to the exhibit.

Following the removal of the photographs, Ianni explained that he removed them because Karon had claimed that she had received anonymous complaints about the display which objected to the

---

[4]Apparently, Professor Trolander had not initially been offended in any way by the pictures; in fact, she participated in the project by posing for a photograph and specifying her specialties. On the day the display was put up, Trolander said that she thought the display was "very nice."

depiction of faculty members with weapons.  Karon also claimed that Professor Trolander had contacted her about the display's upsetting effect on her.  Ianni expressed his belief that the campus was enshrouded in an atmosphere of anxiety due to the earlier threats against Trolander and others.[5] He further explained that his removal of the photographs was an attempt to stop the disruption caused by the display and to prevent aggravation of the atmosphere of fear.  Plaintiffs dispute that any milieu of concern existed and contend that the campus atmosphere, whatever it may have been, was not aggravated or affected by the two photographs.

Copies of the photographs were later posted at the student center by a group of students protesting the administration's actions.  The student center display advanced the subject of censorship and was entitled "The Administration Does Not Want You to See These."  The students used the incidents surrounding the removal of the photographs as an example of impermissible actions under the First Amendment.  Apparently, no complaints were lodged about the student center exhibit, nor was there any evidence of an institutional breakdown upon the showing of the photographs.

Plaintiffs, alleging First Amendment violations, filed this 42 U.S.C. § 1983 action against Chancellor Ianni and the University of

---

[5]The threats to others to which Ianni referred had occurred during the previous year.  In June 1991, Sandra Featherman was appointed UMD Vice Chancellor.  She later began receiving anonymous threats warning her to stay away from Duluth, or face the possibility of kidnapping or even death.  In March 1992, Professor Trolander became the target of similar threats.  Both Featherman and Trolander had been involved in a campus-wide campaign to promote diversity in the UMD community.  In response to these threats, Chancellor Ianni distributed a campus memorandum dated March 16, 1992, assuring the UMD community that the matter was being investigated by local and federal authorities and stating that the school was still committed to improving the conditions for women and minorities on campus.

Minnesota.  Defendants moved for summary judgment, which the district court granted in part and denied in part.  The court dismissed, with prejudice, all plaintiffs' claims against the University of Minnesota, all plaintiffs' claims for money damages against Ianni in his official capacity as Chancellor of UMD, and the Kohns' claims against Ianni for injunctive relief.  The district court denied summary judgment on the remaining contentions, including the issue of qualified immunity for Chancellor Ianni.[6]  The district court found that Chancellor Ianni's actions violated the plaintiffs' clearly established First Amendment rights, in a way that an objective university chancellor would have known.  Burnham v. Ianni, No. 5-94-6, mem. op. at 10-11 (D. Minn. Mar. 17, 1995).  Ianni appeals the denial of summary judgment on this ground, contending that the plaintiffs' First Amendment rights were not clearly established, thereby rendering his actions protected by qualified immunity.  We review the district court's conclusion on the qualified immunity issue de novo.[7]  White v. Holmes, 21 F.3d 277, 279 (8th Cir. 1994).

---

[6]In their amended complaint, plaintiffs sought a declaration that Ianni's actions were unconstitutional, injunctive relief against Ianni in his official capacity, and monetary relief against Ianni in his individual capacity in the amount of at least $50,000, plus interest.  Appellant's App. at 4 (amended complaint).

[7]Because this appeal solely concerns the denial of qualified immunity, implicating only Ianni's liability for money damages, we do not, of course, address plaintiffs' claims for injunctive or other equitable relief.  We note, however, that neither the state's Eleventh Amendment immunity nor the doctrine of qualified immunity would protect Ianni from injunctive or other equitable relief. See, e.g., Treleven v. University of Minnesota, 73 F.3d 816, 819 (8th Cir. 1996) (state's Eleventh Amendment immunity does not shield official from prospective injunctive relief); Grantham v. Trickey, 21 F.3d 289, 295 (8th Cir. 1994) (qualified immunity does not shield officials from equitable relief); Rose v. Nebraska, 748 F.2d 1258, 1262 (8th Cir. 1984) (state's Eleventh Amendment immunity does not shield officials from declaratory or injunctive relief).

## II.  DISCUSSION

Since this matter is before the court on a motion for summary judgment based on qualified immunity, the court "ordinarily must look at the record in the light most favorable to the party [plaintiffs/appellees] opposing the motion, drawing all inferences most favorable to that party." Harlow v. Fitzgerald, 457 U.S. 800, 816 n.26 (1982).  Qualified immunity shields government officials from suit unless their conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.  Id. at 818; Yowell v. Combs, 89 F.3d 542, 544 (8th Cir. 1996).

Chancellor Ianni's assertion that he is protected by qualified immunity triggers a three-pronged inquiry:  (1) whether the plaintiffs have asserted a violation of a constitutional or statutory right; (2) if so, whether that right was clearly established at the time of the violation; and (3) whether, given the facts most favorable to the plaintiffs, there are no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated that right.  Yowell, 89 F.3d at 544.[8]  Ianni focuses on the second prong of this analysis.  He argues that the plaintiffs' rights were not clearly established at the time of the removal of the photographs.  Whether a legally protected interest is clearly established turns on the "objective

---

[8]We have recently framed the inquiry in a slightly different, but substantively similar, way by saying that "we must consider what specific constitutional rights the defendants allegedly violated, whether the rights were clearly established in law at the time of the alleged violation, and whether a reasonable person in the official's position would have known that his conduct would violate such rights."  Waddell v. Forney, 108 F.3d 889, 891 (8th Cir. 1997).

legal reasonableness of an official's acts.  Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate."  Harlow, 457 U.S. at 819.

Ianni bears the burden of proving that the plaintiffs' First Amendment rights were not clearly established.  See, e.g., Siegert v. Gilley, 500 U.S. 226, 231 (1991); Watertown Equip. Co. v. Norwest Bank Watertown, 830 F.2d 1487, 1490 (8th Cir. 1987).  In an attempt to shoulder this burden, Ianni argues that:  (1) some  restrictions on speech in nonpublic forums are constitutionally acceptable and, thus, which restrictions are acceptable in a given situation is never "clearly established;" and (2) the professors were public employees[9] and their First Amendment rights were subject to the fact-intensive Pickering[10] balancing test, thus, precluding the rights from being "clearly established."  These arguments will be addressed in turn.

First, however, we note that the expressive behavior at issue here, i.e., the posting of the photographs within the history department display, qualifies as constitutionally protected speech.  See, e.g., Spence v. Washington, 418 U.S. 405, 410 (1974); Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 505-06 (1969); Tindle v. Caudell, 56 F.3d 966, 969 (8th Cir. 1995).  Nonverbal conduct constitutes speech if it is intended to convey a particularized message and the likelihood is great that the message will be understood by those who view it, regardless of whether it is actually understood in a particular instance in such a way. Spence, 418 U.S. at 411.  Burnham and Marchese, through their

---

[9]The two student/plaintiffs would clearly not be covered by this argument.

[10]Pickering v. Board of Educ., 391 U.S. 563 (1968).

-10-

photographs, were attempting, at least in part, to convey and advocate their scholarly and professorial interests in military history and in military weaponry's part in their vocation.  Michael and Louise Kohn, as well, were attempting to show their creativeness and interest in the scope of the teaching mission of the history department.  The display was the Kohns' idea; they organized and exhibited it.  Because these messages sufficiently satisfy the <u>Spence</u> test, the photographs and the display qualify as speech.  <u>Id.</u>  And, we do not understand that Ianni disputes this conclusion.

Although the right of free speech is not absolute, the First Amendment generally prevents the government from proscribing speech of any kind simply because of disapproval of the ideas expressed.  <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382 (1992).  Indeed, with a few exceptions, most speech receives First Amendment protection.  <u>Cohen v. California</u>, 403 U.S. 15, 24 (1971); <u>see</u>, <u>e.g.</u>, <u>New York v. Ferber</u>, 458 U.S. 747, 756 (1982) (child pornography is unprotected speech); <u>Miller v. California</u>, 413 U.S. 15, 23 (1973) (obscene speech is unprotected speech); <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572 (1942) (fighting words are unprotected speech).  The First Amendment's protection even extends to indecent speech.  <u>Sable Communications v. Federal Communications Comm'n</u>, 492 U.S. 115, 126 (1989).  It also extends to speech unprotected on one basis (e.g., obscenity) but protected on another (e.g., content in opposition to governmental acts).  <u>R.A.V.</u>, 505 U.S. at 384-86.  Clearly then, plaintiffs' speech is worthy of constitutional protection.

Because this case involves Ianni's suppression of plaintiffs' protected speech, plaintiffs have (at least for purposes of summary adjudication) sufficiently established a violation of a constitutional right--unless limitations indigenous to the forum

lawfully permit restrictions on plaintiffs' First Amendment privileges. We turn to that inquiry.

### A. The Forum

Access to and the character of speech on government-controlled areas may be limited depending upon the type of property at issue. Courts recognize three categories of property on which the government may, in greatly varying degrees, restrict speech: (1) public forums, places which by tradition have been devoted to assembly or debate; (2) limited public forums,[11] properties which the state has opened for use by the public as places for expressive activity; and (3) nonpublic forums, places which are not by tradition or designation forums for public communication. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983). In public forums, the state's right to limit expression is "sharply circumscribed." Id. at 45. In limited public and nonpublic forums, however, the state's right to regulate speech is more pervasive.

Ianni argues, and the district court found, that the history department display case is a nonpublic forum. Ianni further claims that because the expression occurred in a nonpublic forum, speech restrictions were permissible or, at least, the extent of any permissible restriction was unclear. Thus, Ianni states,

---

[11]We recognize that both the terms "limited public forum" and "designated public forum" are used to describe this second category of property. See, e.g., International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 686 (1992) (using terms interchangeably); see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983); Capitol Square Review & Advisory Bd. v. Pinette, 115 S. Ct. 2440, 2469 (1995). For purposes of our discussion, we will use the term "limited public forum."

plaintiffs' First Amendment rights were extinguished, limited or at a minimum, not clearly established.  Therefore, Ianni says, the district court's denial of qualified immunity was error.  We disagree.

In this case the nature of the forum makes little difference.[12]  Even if the display case was a nonpublic forum, Ianni is not entitled to qualified immunity.  The Supreme Court has declared that "the State may reserve [a nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  Perry, 460 U.S. at 46; see also Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 394 (1993) (stating control over access to nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral); United States v. Kokinda, 497 U.S. 720, 732 (1990) (stating constitutionality of regulation must be considered in light of the nature and function of the forum involved).  Here, we

---

[12]We do note, however, that the display case could well be a limited public forum.  See Perry, 460 U.S. at 48; Forbes v. Arkansas Educ. Television Comm'n, 93 F.3d 497, 500 (8th Cir. 1996), cert. granted, 117 S. Ct. 1243 (1997).  The case, as earlier noted, was located in the hall outside the history department's classrooms and was intended for public viewing.  UMD had designated it as a forum for use by the history department.  In turn, the history department allowed its faculty and students access to the case--to communicate information about the history department to students, prospective students, faculty and the public on an ongoing basis. If the display case were considered a limited public forum, the content-based suppression at work here would have to have served a compelling state interest and would have to have been narrowly drawn to serve that interest in order to be upheld.  Widmar v. Vincent, 454 U.S. 263, 270 (1981).  However, because we find that the suppression here fails even the most lenient forum test, we need not address this issue.

-13-

find that the suppression was unreasonable both in light of the purpose served by the forum and because of its viewpoint-based discrimination.

The display case was designated for precisely the type of activity for which the Kohns and Professors Burnham and Marchese were using it. It was intended to inform students, faculty and community members of events in and interests of the history department. The University was not obligated to create the display case, nor did it have to open the case for use by history department faculty and students. However, once it chose to open the case, it was prevented from unreasonably distinguishing among the types of speech it would allow within the forum. See, e.g., Lamb's Chapel, 508 U.S. at 392-93; Widmar v. Vincent, 454 U.S. 263, 267 (1981). Since the purpose of the case was the dissemination of information about the history department, the suppression of exactly that type of information was simply not reasonable.

We recognize that UMD "may legally preserve the property under its control for the use to which it is dedicated." Lamb's Chapel, 508 U.S. at 390. However, as the Supreme Court has stated:

> "[A]lthough a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . . , the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject."

Id. at 394 (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806 (1985)).

The suppression of this particular speech was also viewpoint-based discrimination.  As the Supreme Court has noted, in determining whether the government may legitimately exclude a class of speech to preserve the limits of a forum,

> we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

Rosenberger v. Rector and Visitors, 115 S. Ct. 2510, 2517 (1995) (citing Perry, 460 U.S. at 46).  As Rosenberger illustrates, what occurred here was impermissible.  The photographs of Professors Burnham and Marchese expressed the plaintiffs' view that the study of history necessarily involves a study of military history, including the use of military weapons.  Because other persons on the UMD campus objected to this viewpoint, or, at least, to allowing this viewpoint to be expressed in this particular way,  Ianni suppressed the speech to placate the complainants.[13]  To put it simply, the photographs were removed because a handful of individuals apparently objected to the plaintiffs' views on the

---

[13]Although difficult to tell from the record, the objections of Karon, Macleod and Ianni may have been substantially directed toward the display of the weapons on the campus and, perhaps, not simply toward history department curriculum or Burnham's and Marchese's teaching methodology.  Suppression on these more limited grounds, however, would be unconstitutional in light of the purposes served by the display case, as discussed above. Additionally, we do not discern how generalized concerns over the display of weapons in any way advance Ianni's rights of suppression or attenuate Burnham and Marchese's free speech privileges in this case.  The fact that the professors' history-based message happened to fall victim to Ianni's  parochial point of view on exhibiting weapons makes the censorship no less pernicious and no more acceptable, especially given the fact that the purpose of the display was carefully explained to Ianni in advance of his action.

possession and the use of military-type weapons and especially to their exhibition on campus even in an historical context. Freedom of expression, even in a nonpublic forum, may be regulated only for a constitutionally valid reason; there was no such reason in this case.[14]

### B.  Reasonable Public Official

Ianni further claims that at the time the photographs were suppressed, a reasonably objective chancellor of a large public university would not have known that the conduct violated the plaintiffs' constitutional rights.  We again disagree.[15]

As a basic matter, the Supreme Court stated in 1969 "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  Tinker, 393 U.S. at 506.  Indeed, a year earlier, the idea that a faculty member could be compelled to relinquish First Amendment rights in connection with employment at a public school was "unequivocally rejected" by the Supreme Court.  Pickering v. Board of Educ., 391 U.S. 563, 568 (1968).

---

[14]We by no means hold that government has no control over speech in the workplace or the schoolhouse.  We envision many instances when speech, or proposed speech, is beyond the "speaker identity" or "content" designation of the forum and in such instances the speech may be regulated. See Lamb's Chapel, 508 U.S. at 394; Rosenberger, 115 S. Ct. at 2517.  This is not such a case, however.

[15]In this regard, we note that Chancellor Ianni himself stated, at a meeting with the history faculty, that if the plaintiffs brought a lawsuit alleging a violation of their First Amendment rights, "they might have a good case."

Applying these long established tenets to this case, we note that our earlier quotation from Rosenberger, 115 S. Ct. at 2517, links its observations on viewpoint discrimination within a nonpublic forum to Perry, 460 U.S. at 46, a teacher speech case decided by the Supreme Court in 1983. Similarly, the language proscribing viewpoint discrimination found in Lamb's Chapel, 508 U.S. at 394, quotes directly from Cornelius, 473 U.S. at 806, a 1985 decision. In addition, Widmar's holding prohibiting unreasonable discrimination among "types of expression" within a specific forum, clearly made in the context of an analysis of the purpose of the particular forum, was available as early as 1981. Widmar, 454 U.S. at 265-67, 277.

Judge Heaney, writing for a panel of this court, recently noted that once a controlling opinion has been decided, a constitutional right has been clearly established.[16] See Waddell v. Forney, 108 F.3d 889, 893 (8th Cir. 1997). And, admittedly, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). But, as noted by Judge McMillian in his opinion for the court in Hayes v. Long, 72 F.3d 70, 73 (8th Cir. 1995), "[t]his court has taken a broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry." More particularly, he stated, with regard to "clearly established" law, that:

---

[16]Some circuits have been slightly more charitable on this timing issue. In Lintz v. Skipski, 25 F.3d 304 (6th Cir. 1994), the Sixth Circuit stated: "[S]tate officials must have some time to adjust to and learn about judge-made law as it evolves . . . . This [the Sixth] and other circuits have struggled to decide how long after a decision state officials have to become familiar with 'the law.'" Id. at 306. Lintz then cited an extensive list of cases allowing from twelve days to five months.

-17-

"In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful. In the absence of binding precedent, a court should look to all available decisional law including decisions of state courts, other circuits and district courts. . . ."

Id. at 73-74 (quoting Norfleet v. Arkansas Dep't of Human Servs., 989 F.2d 289, 291 (8th Cir. 1993)).

Here, of course, we have long established, binding precedent totally supportive of plaintiffs' claims. The Supreme Court and this court have both clearly and directly spoken on the subject on numerous occasions and in years long prior to the 1992 censorship by Ianni. Accordingly, Chancellor Ianni's "not clearly established" claim must be rejected.[17]

## C. Pickering Balancing Argument

Finally, Chancellor Ianni seizes upon the two incidents involving threats to Ms. Featherman and Ms. Trolander in an attempt to interject First Amendment precedent not applicable to this dispute. We reject this endeavor.

Ianni contends that the plaintiffs' rights to express this particular speech must additionally be balanced against UMD's right to suppress it in the name of workplace efficiency and harmony. He

---

[17]The record establishes, as noted, that the history department contacted the law department of the University for an opinion on the propriety of the display. One may only presume that Chancellor Ianni had equal or superior resources at his disposal if he had questions about the contours of these well-defined constitutional rights.

urges this court to invoke a line of employee discipline and termination cases to summarily dispose of any violation of constitutional rights. <u>See</u>, <u>e.g.</u>, <u>Pickering</u>, 391 U.S. 563 (teacher discharged for writing letter to newspaper criticizing school board and school superintendent); <u>Connick v. Myers</u>, 461 U.S. 138 (1983) (assistant district attorney discharged for distributing questionnaire concerning office morale, policy and confidence in supervisors). We decline to do so here.

The Supreme Court, in <u>Pickering</u>, held that in an employee discipline case, a court must determine whether the employee's speech was on matter of public concern, and if so, whether the employee's interest in that speech is outweighed by the governmental employer's interest in promoting the efficiency and effectiveness of the services it performs. <u>Pickering</u>, 391 U.S. at 568. In conjunction with his argument in favor of this balancing requirement, Ianni also advances the theory that government employers must always be granted qualified immunity under such circumstances. We not only find that the <u>Pickering</u> balancing test is inapposite under these facts, but we also disagree with Ianni's analysis of qualified immunity law.

The <u>Pickering</u> standard applies to determinations of whether a public employer has properly discharged or disciplined an employee for engaging in speech. <u>Waters v. Churchill</u>, 511 U.S. 661, 668 (1994); <u>Rankin v. McPherson</u>, 483 U.S. 378, 384 (1987); <u>Kincade v. City of Blue Springs</u>, 64 F.3d 389, 395 (8th Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 1565 (1996). In this case, it is argued that there is no adverse employment action (unless the censorship itself

serves that purpose), against which the plaintiffs' free speech rights might be balanced.[18]  Indeed, the district court found:

> The gravamen of the complaint is not whether the photographs were the basis for adverse employment action; rather, the gravamen of the complaint is whether the ideas conveyed in the photographs fall within any of the exceptions to the general rule "that under our Constitution, the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of the hearers."

Burnham, mem. op. at 10 (quoting Street v. New York, 394 U.S. 576, 592 (1969)).

We need not decide whether an adverse employment action can  be fashioned from the evidence, however, because Ianni has factually failed to put the Pickering balancing test in play.  See, e.g., Kincade, 64 F.3d at 398.  As this court recently observed, "it is critical to determine whether the defendants [employers] have put the Pickering balancing test at issue by producing evidence that the speech activity had an adverse effect on the efficiency of the . . . employer's operations."  Grantham v. Trickey, 21 F.3d 289, 294 (8th Cir. 1994).  As the district court found, "[t]his is not an employment case where there is a threatened disruption to the efficient delivery of services."  Burnham, mem. op. at 9; see also Pickering, 391 U.S. at 570 (noting

_____

[18]The speech at issue in Pickering and Connick was directly critical of the efficiency and operations of the employers' businesses.  Here the speech essentially supported University operations and extolled the capabilities and interests of certain faculty members.  Moreover, the photographs of Burnham and Marchese were not presumptively divisive, even in the ambiance of the threats on campus, nor were they shown to have been a palpable threat to workplace morale, efficiency or harmony.  Compare Tindle, 56 F.3d at 969 (police officer suspended for attending Fraternal Order of Police party wearing blackened face, bib overalls, black curly wig and carrying watermelon).

-20-

that "no evidence to support [professional damage to the school board and superintendent] was introduced at the hearing" and rejecting the workplace disruption argument of the board.)

As in our Kincade decision, we find that Ianni has failed to carry his burden on this prong of the Pickering rationale. Ianni has made no factual showing that the suppressed conduct "substantially" interfered with the efficiency of the workplace or UMD's educational mission. Kincade, 64 F.3d at 398. "In our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Tinker, 393 U.S. at 508. It is simply unreasonable, as a matter of law, to assert that a photograph of a cardboard laurel-wreath bedecked faculty member holding a Roman short sword, as part of an eleven-person faculty display, somehow exacerbated an unestablished ambiance of fear on the UMD campus.

And, even if the Pickering balancing test were somehow applicable, which it is not, Ianni's defense would fail. As stated earlier, the Pickering balancing test requires a court to determine whether the employee's speech involves a matter of public concern and, if so, how the employee's rights in the speech balance against the occurrence of workplace disruption. Both of these questions are issues of law for the court to decide. Kincade, 64 F.3d at 395.

To determine whether the speech at issue here involves a matter of public concern, we examine the "content, form and context" of the speech, given the record as a whole. Connick, 461 U.S. at 147-48. To be considered speech on a matter of public concern, the discourse must relate to a "matter of political, social, or other concern to the community." Id. at 146; see also Kincade, 64 F.3d at 396. That definition includes many types of

speech, excluding mainly speech relating merely to internal office grievances.  <u>Connick</u>, 461 U.S. at 148-49; <u>see also</u> <u>Cox v. Dardanelle Pub. Sch. Dist.</u>, 790 F.2d 668, 672 (8th Cir. 1986).

The history exhibit, displayed for public viewing, was intended, at least, to inform the University and surrounding community of the views and specialties of the history department and its faculty.  As such, the speech involved more than a mere internal office grievance.  <u>See</u>, <u>e.g.</u>, <u>Cox</u>, 790 F.2d at 673 (stating "educational theories and practices employed by school administrators is clearly a question of public concern . . . [h]ow we teach the young, what we teach them, and the environment in which we teach them are of the most central concern to every community in the nation").  <u>See also</u> <u>Lewis v. Harrison Sch. Dist. No. 1</u>, 805 F.2d 310, 314 (8th Cir. 1986) (holding speech involving proposed transfer of teacher was on matter of public concern due to large turnout at meeting regarding transfer and teacher interest in the subject); <u>Roberts v. Van Buren Pub. Schs.</u>, 773 F.2d 949, 955 (8th Cir. 1985) (holding speech involving content of rules governing fifth grade field trip was on matter of public concern due to parental dissatisfaction with and interest in the subject).
Admittedly, the speech at issue here is not of the utmost public concern when compared with an assassination attempt against the President, as in <u>Rankin</u>.  483 U.S. at 381.  However, when balancing an employee's interest against an employer's interest, the constitutional standard takes proportionality into account.  "[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." <u>Jeffries v. Harleston</u>, 52 F.3d 9, 13 (2d Cir.), <u>cert. denied</u>, 116 S. Ct. 173 (1995).  The converse is also true.  When weighed against the meager evidence of workplace disruption, the plaintiffs' speech

-22-

clearly addresses matters of public concern within the meaning of the Pickering test.  See supra n.3.

Our next consideration is whether UMD's interest in suppressing the speech, to purportedly control workplace disruption, outweighs the plaintiffs' First Amendment rights in the display.  See, e.g., Barnard v. Jackson County, Missouri, 43 F.3d 1218, 1224 (8th Cir.) (stating pertinent considerations for Pickering balancing test are "whether the employee's speech has a detrimental impact on working relationships where personal loyalty or confidence is necessary, and whether the speech impedes the efficient operation of the governmental entity's function"), cert. denied, 116 S. Ct. 53 (1995).  The government employer must make a substantial showing that the speech is, in fact, disruptive before the speech may be punished.  Waters, 511 U.S. at 673.  We recognize that the government, as an employer, has broader powers in suppressing free speech than the government as a sovereign.  Indeed, we have given some deference to an employer's predictions of workplace disruption.  Id.  However, we have never granted any deference to a government supervisor's bald assertions of harm based on conclusory hearsay and rank speculation.  As stated above, the procedural posture of this case requires us to view the facts in the light most favorable to the nonmoving party, i.e., the plaintiffs. In so doing, we note that both Burnham and Marchese, by affidavit, expressly dispute that a "climate of fear and violence" existed on the campus, stating that campus life continued as normal, no classes were suspended or schedules altered and not a single act of violence occurred on UMD premises.

Even if we were to attempt to balance the plaintiffs' free speech rights against the purported disruption of the pedagogical tasks of UMD, it is clear that the impact of the speech on UMD's mission is totally unproven and unaddressed except in the most

conclusory fashion.  There is simply no evidence that establishes a nexus between the two photographs and an exacerbated climate of fear on the campus or, more importantly, that establishes a relationship between the photographs and a decrease in the efficiency and effectiveness of UMD's educational mission.

In sum, then, upholding Ianni's approach to the First Amendment would permit the suppression of too much speech on arbitrary and capricious grounds.  Such a holding would presumably permit the suppression of Ms. Featherman's advocacy of gender and cultural diversity at UMD if Ianni felt that such speech contributed to an inefficient and  negative working and learning environment on the campus because of unlawful or vehement opposition to Featherman's views.[19]  "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."  Rankin, 483 U.S. at 384.

Finally, we hold that Ianni's failure to establish workplace disruption or, at least, to make a connection between the plaintiffs' speech and the workplace atmosphere, is fatal to his claim of qualified immunity under a Pickering analysis.  Kincade is both directly on point and directly contradictory to Ianni's position.  Kincade was discharged by Blue Springs for exercising

---

[19]Underlying our holding today, in some respect, is the recognition of the professors' academic freedom--"a special concern of the First Amendment."  University of California Regents v. Bakke, 438 U.S. 265, 312 (1978).  The content-based censorship which occurred here could easily have a stifling effect on the "'free play of the spirit which all teachers ought especially to cultivate and practice.'"  Keyishian v. Board of Regents, 385 U.S. 589, 601 (1967) (quoting Baggett v. Bullitt, 377 U.S. 360, 374 (1964)).

his free speech rights.  Because Kincade's speech, as here, touched on a matter of public concern, the Pickering balancing test was employed to review the district court's denial of a motion for summary judgment on qualified immunity grounds.  After noting that the only evidence of workplace disruption was conclusory statements to that effect by the mayor and other city officials, Judge Hansen stated:

> the Appellants [city officials] have merely asserted that Kincade's speech adversely affected the efficiency of the City's operations and substantially disrupted the work environment without presenting any specific evidence to support this assertion.  They therefore have not put the Pickering balancing test at issue, and accordingly, we reject their claim that they are entitled to qualified immunity because free speech questions for public employees, as a matter of law, cannot be "clearly established."

Kincade, 64 F.3d at 398-99.  This is precisely the factual and legal situation we have in this case.


## III.  CONCLUSION


The district court correctly found that Ianni is not entitled to qualified immunity from a suit seeking money damages for the violation of plaintiffs' First Amendment rights.  Accordingly, we affirm.

-25-

McMILLIAN, Circuit Judge, with whom JOHN R. GIBSON, Circuit Judge, joins, dissenting.

We respectfully dissent. In our original panel opinion, <u>Burnham v. Ianni</u>, 98 F.3d 1007 (8th Cir.), <u>vacated</u>, 98 F.3d 1028 (1996), we fully set forth our analysis of this case. We therefore rest upon our original panel opinion as providing the reasons why we believe Ianni should be afforded qualified immunity in the present case. The following is a response to the majority opinion.

I.

We begin by noting the conspicuous absence from the majority opinion of certain undisputed material facts concerning the circumstances in which this controversy arose -- facts which the majority has all but ignored by reducing them to a few obtuse sentences and a footnote. <u>See</u> <u>supra</u> at 6, 7 & n.5. By contrast, the district court appropriately devoted four full paragraphs at the outset of its opinion to these crucial facts aptly described by the district court as the "milieu" of the case. <u>Burnham v. Ianni</u>, 899 F. Supp. at 397. As the district court explained:

> In June 1991, Sandra Featherman was appointed to the post of vice chancellor for [UMD]. Shortly after her appointment was announced, Featherman began receiving threats. The threats were bizarre, graphic and frightening:
>
> > The dogs are howling, they want blood. There are footsteps crunching on the forest floor--it's the deer hunters coming. They're after blood, too. It's the same dream over and over. The deer hunters stalking--getting closer and closer, never giving up the hunt, never putting down their rifles. Overwhelmed by their desire to kill.
> >
> > . . . .

-26-

> Federman (sic) no Duluth stay away, we will kidnap you,
> the FBI can't protect you.
> The deer hunters.

At the same time that Featherman was being threatened, forged memoranda bearing the defendant's name, were circulated in and about the campus. The memoranda referred to an alleged plot to kidnap Featherman and used the terms "Prince of Death" and "Deer Hunters." The forged document was circulated through the mail to various departments and left in hallways of various campus buildings.

Beginning in March 1992, history Professor Judith Trolander became the target of threats. The caption on the flyers left in the hallways of various University buildings was: "The Imperial Council of Deer Hunters Proclaim Open Season on Judy Trolander Lesbian Feminist Bitch." The memorandum purported to reveal Professor Trolander's home address, addressed questions concerning the appropriate weapons and provided the reader with potential locations from which to carry out an attack. Finally, the flyer proclaimed: "Get cracking you kill crazy buckaroos. Its [sic] OK to kill her, the Imperial Council rules UMD, the Commission on Women is dissolved." The flyer specifically addressed Professor Trolander, but its threat was targeted to all faculty members who cooperated with Vice Chancellor Ianni's efforts to develop a diversity program: "[a]ll faculty would be sentenced to death along with their pets, children and spouses."

Defendant undertook to calm the concerns of the faculty regarding these incidents. Despite his distribution of a memorandum in which he addressed the seriousness with which he was taking the threats and in which he reiterated his commitment to the diversity program, the fears of many in the campus were not alleviated. The investigation of the origin of the threats continued and the threats continued to hang over the campus. It is this background against which the substance of this litigation arose.

Id.

Not only do we find it necessary to supply these critical facts, we also caution that there is no legal basis to assume as true facts "derived from the plaintiffs' pleadings" merely "[b]ecause discovery has not been conducted in this case." Supra at 2. In ruling on a motion for summary judgment, the question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992); St. Paul Fire & Marine Ins. Co. v. FDIC, 968 F.2d 695, 699 (8th Cir. 1992). Where discovery has not been conducted, the record created by the parties pursuant to Fed. R. Civ. P. 56 might not include the usual panoply of discovered documents and deposition transcripts, but will include any affidavits or other documents properly submitted in accordance with Fed. R. Civ. P. 56(e). If, upon reviewing the record in the light most favorable to the non-moving party, some material facts asserted in the non-moving party's pleadings remain genuinely disputed, there is no legal basis to assume such facts as true merely because discovery has not been conducted. In the present case, for example, the majority opinion states "[p]laintiffs dispute that any milieu of concern existed and contend that the campus atmosphere, whatever it may have been, was not aggravated or affected by the two photographs." Supra at 7 (emphasis added). The majority supplements the above-underscored statement by later noting that "both Burnham and Marchese, by affidavit, expressly dispute that a 'climate of fear and violence' existed on the campus, stating that campus life continued as normal, no classes were suspended or schedules altered and not a single act of violence occurred on the UMD premises." Id. at 23 (emphasis

added).  Presumably, the majority's assumptions that no milieu of concern existed at the time the photographs were removed, and that campus life continued as normal, have formed the basis for the majority's decision to virtually ignore the facts set forth above.  However, according to undisputed evidence in the record, less than two months before the photographs were removed, anonymously-written flyers were left in hallways of various UMD buildings on campus, and those flyers stated the following:

> She [Professor Trolander] will be a good target for shooting at long range.  The house has large windows and the terrain is clear of obstacles in all directions.  Shooting from the beach or even from a boat in the bay or lake Superior is feasible.  A 30-60 rifle with 20X2 Bushnell scope would be a suitable weapon with dum-dum bullets dipped in poison.  Don't forget to put in a couple of clicks in the crosshairs for windage as the wind is usually strong there.  It is recommended that the hunter shoot from behind the Surf and Sand Health Center, if there is return fire from the house it will only kill a few old people.  She is the only occupant of the house, so it is OK to shoot silhouettes on drawn shades.
>
> Get cracking you kill crazy buckaroos.  Its OK to kill her, the Imperial Counsel rules UMD, the commission on women is dissolved.
>
> Also, all faculty members ordered to participate in Featherman's administrative development project will be sentenced to death along with their pets, children, and spouses if they comply with these orders.  Any one who cooperates with Featherman will have their target information published.
>
> The deer hunters need target information on Featherman, just mention where she lives in the faculty club and everything will be taken care of.

Appellant's Appendix at 38.  We certainly agree with the majority's description of the above-quoted death threat as "deranged."  Supra at 6.  However, viewing the record in the light most favorable to plaintiffs and applying the Rule 56 standard, we would also find

-29-

plaintiffs' description of campus life as "normal" to be patently inaccurate. Even the district court stated, consistent with the Rule 56 standard, that, despite Ianni's efforts to assuage concerns on campus, "the fears of many in the campus community were not alleviated. The investigation of the origin of the threats continued and the threats continued to hang over the campus." 899 F. Supp. at 397. As the district court concluded, "[i]t is this background against which the substance of this litigation arose." Id.

## II.

We now turn to the legal issues presented by this case, beginning with a reminder of the principles that underlie the doctrine of qualified immunity. In Anderson v. Creighton, 483 U.S. at 638 (citations omitted), the Supreme Court explained:

> When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

The Court then went on to explain:

> Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness"

of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.

Id. at 639 (citations omitted). In Anderson v. Creighton, the Supreme Court also addressed the degree of generality versus specificity with which the relevant legal rule is to be defined for purposes of determining whether the law was "clearly established" at the time of the relevant events. Id. The Court explained that, in order for the concept of a "clearly established" law to comport with the "objective legal reasonableness" standard set forth in Harlow v. Fitzgerald, 457 U.S. at 819, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Anderson v. Creighton, 483 U.S. at 640. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (citations omitted).

We believe, in the present case, that it could not have been apparent to Ianni that the actions he took were unlawful in light of the pre-existing law. Indeed, "the parameters of the protection afforded to a university professor's academic speech were not clearly defined in May 1992 and are not clearly defined today." Scallet v. Rosenblum, No. 96-1138, 1997 WL 33077, at *2 (4th Cir. Jan. 29, 1997) (unpublished) (per curiam) (Scallet) (disposition reported in table at 106 F.3d 391), cert. denied, No. 96-1725 (U.S. June 23, 1997).

As we explained in our original panel opinion, the issue of whether the removal of the two photographs violated Burnham's and Marchese's First Amendment right to engage in nonverbal expressive behavior is governed by the Pickering-Connick-Waters line of

Supreme Court cases dealing with the First Amendment rights of public employees.  The mere fact that the circumstances of this case are unique (at least in terms of the controversies that have actually been litigated in federal court) makes this no less an employment-related case.  Thus, the pertinent case law in existence at the time Ianni removed the photographs from the display case included the Supreme Court's decisions in Connick and Pickering, as well as a body of lower federal court decisions which had applied Connick and Pickering -- none of which were factually similar to the present case.

Contrary to the majority's assertion, Kincade is not "directly on point and directly contradictory to Ianni's position."  Supra at 25. Kincade is distinguishable because, in that case, this court held that the Pickering balancing test had not been put at issue.  This court reasoned that the defendants, city officials, "ha[d] merely asserted that Kincade's speech adversely affected the efficiency of the City's operations and substantially disrupted the work environment without presenting any specific evidence to support this assertion."  Kincade, 64 F.3d at 398 (emphasis added) (cited supra at 25).  By contrast, in the present case, Ianni presented specific evidence showing that the photographs were already having a disruptive effect on the work environment and that their continued display in the history department display case had the potential to further disrupt the work environment.  Before Ianni ever made the decision to have the photographs removed, meetings were held, involving Karon, Ianni, the Kohns, Burnham, Marchese, and other faculty members in the history department, at which the fate of the two photographs was specifically addressed.  It is clear from the record that feelings were strong on both sides: some individuals felt that the display of photographs of professors holding weapons was inappropriate in light of the campus-wide death threats against Trolander and others; others felt

adamantly opposed to removing the photographs for that reason. <u>See</u> Appellant's Appendix at 50 (internal history department memorandum: "[s]omehow, this ugly trend of History governance by external administrators and bureaucrats must be called into account; if the photo display is our line in the sand, so be it"). With respect to one of the meetings, Karon stated:

> Chancellor Larry Ianni and I [Karon] met with the history department faculty on one occasion during the first few days of May. Department members offered a variety of reasons for not wanting to take the photos down. Some said the request was an undue interference with the department, or an attempt to blame the department for the threats. Others said it was Judy Trolander's fault. Professor Trolander expressed her concern that no one knew how upsetting the photos were to her.

Appellant's Appendix at 12 (Affidavit of Judith Karon, ¶ 13).

We think it fair to say that Ianni, as the unlucky decisionmaker in this employment-related controversy, was between a rock and a hard place. Regardless of whether he decided to have the photographs removed or left alone, it was reasonable for him to assume that some faculty members would be quite upset. In explaining his decision to remove the photographs, Ianni stated in his affidavit that the situation with which he was dealing was unique in his experience, that he tried suggesting to the history department faculty that "it would be an act of collegiality to remove the photos" and they "should all be sympathetic to the effects of the agitation on campus," and that, after the history department refused to accept his suggestion, he ordered the photographs removed with the intent "to try to maintain a positive and efficient working and learning environment conducive to the mission of an academic institution." <u>Id.</u> at 7-8 (Affidavit of Lawrence Ianni, ¶¶ 8-11). Ianni himself was not personally opposed

to the photographs. <u>See</u> Supplemental Appendix of Appellees at 37 (Affidavit of Albert Burnham, ¶ 4 ("Ianni stated that he personally saw nothing wrong with the pictures")). He had them removed because of their antagonistic effect.

Plaintiffs have not disputed the truthfulness of Ianni's stated reason for removing the photographs, nor have plaintiffs alleged or identified anything in the record to suggest that Ianni had any motive other than those which he described in his affidavit. Instead, plaintiffs maintain that it was utterly irrational for Ianni to think that removing the photographs would serve his stated goal. Looking upon Ianni's actions with the benefit of hindsight, the majority agrees with plaintiffs and further concludes that Ianni's actions also violated clearly established First Amendment law as it existed in May of 1992. We disagree.

As we have noted, even today the parameters of the First Amendment protection afforded to university professors' academic speech is not clearly defined -- much less so at the time this controversy arose. <u>See</u> <u>Scallet</u>, 1997 WL 33077, at *2. Moreover, viewing the record in the light most favorable to plaintiffs does not dispel the fact that, no matter what course of action Ianni had followed with respect to the two photographs, the end result would have been the dissatisfaction of some faculty members, and most likely disruption to the work environment -- at least insofar as those who had already taken sides were concerned. Faced with this highly unusual and unenviable predicament, Ianni chose to have the photographs removed, in the hopes of maintaining a positive and efficient working and learning environment. In our opinion, it is not appropriate, given the facts of this case, for this court to now decide the qualified immunity issue on the basis of whether we think Ianni should have dismissed the concerns expressed by

-34-

Trolander, Karon, and others as irrational or unjustified; that was a matter with which Ianni, as the responsible school administrator, was forced to grapple at that time. The circumstances only permitted him to accommodate one side's interests or the other's, but not both. We believe that the Supreme Court has indicated, as a matter of substantive First Amendment law, that it may not be appropriate for this court to second-guess Ianni's handling of this employment-related matter. As the Supreme Court stated in <u>Waters</u>, 511 U.S. at 675 (emphasis added):

> The key to First Amendment analysis of government employment decisions . . . is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. <u>But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.</u>

We also reiterate a point emphasized in our original panel opinion. In considering the weight to be given Ianni's perceptions and predictions of disruption, the law provides that the disruption need not have been actual, but may have been merely potential. <u>Id.</u> at 681 (holding, as a matter of law, that the potential disruptiveness of the speech was enough to outweigh whatever First Amendment value it might have had); <u>Tindle</u>, 56 F.3d at 972 ("[a] showing of actual disruption is not always required in the balancing process under <u>Pickering</u>"); <u>accord</u> <u>Jeffries</u>, 52 F.3d at 13 (noting that <u>Waters</u> stresses that actual disruption is not required). Notably, on this particular point, <u>Kincade</u> does not even mention <u>Waters</u>, let alone rely on that Supreme Court precedent. In light of <u>Waters</u>, its progeny, and our understanding of Ianni's predicament in this case, we conclude that Ianni did not

violate Burnham's or Marchese's First Amendment right to engage in nonverbal expressive conduct when he ordered the removal of the two photographs from the display case; in any event, he certainly did not violate their *clearly established* First Amendment rights.  "In view of the difficulty that federal courts themselves have had in grappling with the concepts of academic freedom both as to the teacher and the educational institution, [Vice Chancellor Ianni, who is] not trained in the law could hardly be expected to recognize the contours of [Burnham's and Marchese's] rights."  Scallet, 1997 WL 33077, at *2.  We would therefore hold that Ianni is entitled to qualified immunity with respect to the claims brought by Burnham and Marchese based upon their alleged nonverbal expressive conduct.[20]

Finally, we believe that our position is well-grounded in Eighth Circuit jurisprudence.  In Grantham v. Trickey, 21 F.3d at 292-95, Judge Hansen, writing for a panel of this court, set forth a comprehensive and balanced historical analysis of Eighth Circuit case law dealing specifically with the applicability of qualified immunity in the public employee speech context.  In Grantham v. Trickey, id. at 295, this court affirmed the district court's grant of summary judgment for the defendants on the basis of qualified immunity upon determining that it was appropriate under the

---

[20]In light of the complexities of the law with which we are dealing, including the balancing process required by the First Amendment and the "clearly established" standard imposed by the qualified immunity doctrine, we are not swayed by plaintiffs' allegations that Ianni himself speculated that "if we [plaintiffs] sued him, he 'would not stand a chance,' or words to that effect." Supplemental Appendix of Appellees at 38 (Affidavit of Albert Burnham, ¶ 8); see also id. at 40 (Affidavit of Richard Morris (stating, for example, that "[w]hile I do not recall the exact words used by Chancellor Ianni, I understood the import of his remarks to be that he believed that the censorship of the photographs violated the legal rights of the persons involved.")).

circumstances of that case to follow the analysis of <u>Bartlett v. Fisher</u>, 972 F.2d 911 (8th Cir. 1992) (reversing the district court's denial of summary judgment for the defendants on the basis of qualified immunity). In <u>Bartlett v. Fisher</u>, <u>id.</u> at 914, 916-17, Judge Loken also took care to recognize the historical and policy-based underpinnings of the qualified immunity doctrine in this area of First Amendment law.  In reasoning that the defendants in that case were entitled to qualified immunity, Judge Loken noted "[a]t least five circuits have concluded that, *because* <u>*Pickering*</u>*'s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of the* <u>*Harlow*</u> *qualified immunity standard.*"[21]  <u>Id.</u> at 916 (emphasis added) (quoted in <u>Grantham v. Trickey</u>, 21 F.3d at 293).  We, too, agree with this general statement of the law and think that the present

_____

[21]A very similar view has been expressed by our court in other constitutional contexts.  For example, in <u>Manzano v. South Dakota Dep't of Social Servs.</u>, 60 F.3d 505, 509-11 (8th Cir. 1995), we observed that the constitutionally protected liberty interest which parents have in familial integrity is not absolute, and when a parent alleges that official conduct infringed upon that right, the merits of that constitutional challenge are determined by a balancing test.  We then observed that "[t]he need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome."  <u>Id.</u> at 510.  "Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable."  <u>Id.</u> (citing cases).  In <u>Myers v. Morris</u>, 810 F.2d 1437, 1462 (8th Cir. 1987), also a case involving the constitutional right of familial integrity, we applied the doctrine of qualified immunity after noting our agreement with the Seventh Circuit's observation in <u>Benson v. Allphin</u>, 786 F.2d 268, 276 (7th Cir.), <u>cert. denied</u>, 479 U.S. 848 (1986), that, when a determination of constitutional protection turns on application of a balancing test, "the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent."

case is not an exception.[22]  Even if we were to agree with the majority of this en banc court that Ianni has violated plaintiffs' clearly established First Amendment rights, we would favor acknowledging the above-quoted rule of law, which takes into account the tensions and subtleties that lie in this area of First Amendment jurisprudence, particularly when superimposed with the doctrine of qualified immunity.

## III.

We now turn to the forum-related arguments.  Plaintiffs, including the Kohns, assert a violation of their First Amendment right to use the display case as a means "to publicize some of the areas of expertise and interest of the History Department's faculty, while at the same time portraying the faculty in an informal, somewhat humorous way."  In analyzing this claim, we agree with the district court's conclusion that the history department display case was a nonpublic forum.  899 F. Supp. at 403 (focusing on facts that the display case was under UMD's control,

---

[22]We are by no means suggesting that qualified immunity will protect public officials in every instance where the applicable constitutional standard involves a balancing test.  As plaintiffs have pointed out, this court has on at least two occasions denied qualified immunity to school officials who violated teachers' First Amendment rights under Pickering.  See Southside Pub. Schs. v. Hill, 827 F.2d 270, 272-75 (8th Cir. 1987) (denying qualified immunity to defendants, school officials, who had constructively terminated elementary school teachers in retaliation for having written a letter to the state department of education complaining about violations of the federal statutory requirement that handicapped children be provided a free appropriate public education); Lewis v. Harrison Sch. Dist. No. 1, 805 F.2d 310, 318 (8th Cir. 1986) (qualified immunity denied to school superintendent and school board members who fired school principal for the stated reason, among others, that he had publicly criticized their decision to transfer his wife from the high school to the junior high school level).

that UMD allowed members of the history club to use it upon request, and that the display case was dedicated to use of the UMD history department for disseminating information about the department). Because the display case was a nonpublic forum, the issue as to whether a First Amendment violation resulted from the removal of the two photographs turns on whether "the distinctions drawn [were] reasonable in light of the purpose served by the forum and [were] viewpoint neutral." Cornelius, 473 U.S. at 806. So long as these requirements are met, "[c]ontrol over access to a nonpublic forum can be based on subject matter." Id. "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." Id. at 809. We believe that Ianni's decision to remove the two photographs was not an unreasonable subject matter restriction in light of the purpose of the forum, which was to disseminate information about the history department, and because his actions were narrowly tailored and left open other channels through which Burnham's and Marchese's interests in classical and American military history could still be publicized.[23] See Perry, 460 U.S. at 53 ("the reasonableness of the limitations . . . is also supported by the substantial alternative channels that remain open"). Moreover, Ianni has demonstrated beyond any dispute that his removal of the photographs had nothing whatsoever to do with any viewpoint which the photographs may have expressed. Contrary to the majority's conclusion, this was not "an effort to suppress expression merely because [Ianni] oppose[d] the speaker[s'] view[s]." Id. at 46. Burnham himself alleges that "Ianni stated that he personally saw nothing wrong with the

_____

[23]For example, nothing prevented plaintiffs from replacing the removed photographs with similar pictures of Burnham and Marchese without weapons, while continuing to publicize through written descriptions their interests in American military and classical history.

pictures." Supplemental Appendix of Appellees at 37 (Affidavit of Albert Burnham, ¶ 4). Ianni was motivated solely by his desire to address the potential disruptiveness of the photographs, which had already been foreshadowed by the diametrically opposed views expressed at the history department meetings.

The majority states that "[t]he photographs of Professors Burnham and Marchese expressed the plaintiffs' view that the study of history necessarily involves a study of military history, including the use of military weapons." Supra at 15. There is absolutely nothing in the record stating or implying that Ianni or anyone else opposed such a view about the study of history. The majority further states that Ianni had the photographs removed "[b]ecause other persons on the UMD campus objected . . . to allowing this viewpoint to be expressed in this particular way." Id. This is precisely the point that we have been making all along -- Ianni was attempting to address the potential disruptiveness of the photographs, not any viewpoint expressed by them. Moreover, his actions were not unreasonable in light of the circumstances. Nothing in his actions prevented plaintiffs from expressing the above-described message through other means -- which, in fact, they clearly could do through the exhibit's written descriptions of the professors' academic interests. See Supplemental Appendix of Appellees at 30 (Affidavit of Ronald Marchese, ¶ 9 ("Professor Burnham listed U.S. Military History among his principal interests")). We also think the reasonableness of Ianni's actions is supported by the facts that, after school resumed the following fall, the two photographs were posted in the student center and Ianni took no action at that time because "[t]he atmosphere was substantially calmer after the summer break of 1992." Appellant's Appendix at 8 (Affidavit of Lawrence Ianni, ¶ 12).

In sum, we would hold as a matter of law that Ianni did not violate plaintiffs' First Amendment rights by regulating the use of the display case. We most certainly believe that his actions did not violate any clearly established First Amendment rights and, thus, he should be afforded qualified immunity with respect to plaintiffs' forum-related claims.

## IV.

Ianni did not violate any of plaintiffs' First Amendment rights when he ordered the removal of the two photographs from the display case. More importantly, given the "background against which the substance of this litigation arose," 899 F. Supp. at 397, and the lack of clarity in the applicable law as it existed in May of 1992, Ianni should be afforded qualified immunity. He should be spared from having to further defend himself in this litigation and from having to pay money damages to UMD history professors Albert Burnham and Ronald Marchese and former UMD students Michael Kohn and Louise Kohn.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-41-